## ATKINS v. UNITED STATES.
### No. 6128.

Court of Appeals of the District of Columbia.

Argued March 12, 1934.

Decided April 9, 1934.

James Conlon, of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., John W. Wood, Asst. U. S. Atty., and Young M. Smith, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appeal from a judgment for the defendant (appellee here) upon a war-risk insurance policy, the jury having found for the United States.

Appellant, who enlisted July 15, 1917, served overseas as a private until about a month before his discharge at Camp Jackson, S. C., on April 8, 1919. While in the service he obtained war-risk insurance against death or total permanent disability. His policy lapsed on May 31, 1919, for nonpayment of premiums. In this action, filed November 7, 1928, he claims that prior to the lapse of the policy he was totally and permanently disabled. His evidence tends to prove that he has a mental ailment known as "dementia praecox."

The record is unreasonably long and involved. A concise statement of the facts deemed material will furnish a basis on which to dispose of the appeal.

On April 5, 1919, just prior to being mustered out of the Army, appellant was given a careful medical examination and was found physically and mentally sound. He signed a declaration in the presence of his commanding officer in connection with an official "Report of physical examination prior to separation from service." In that declaration appellant stated his belief that he was not suffering from the effects of any wound, injury, or disease, or that he had any disability or impairment of health.

The evidence indicates that upon his arrival at his home in Knoxville, Tenn. (following his discharge), he was profane and abusive to members of his family, but whether this was due to intoxication or to some other cause is not clear. It does appear that he worked at a filling station and roadhouse for six weeks before leaving Knoxville for Akron, Ohio. He was then examined (on May 20, 1919) by a physician of the Goodyear Rubber Company and found to be in good enough physical condition to be acceptable for employment by that company. He entered its employ and continued therein for two or three months.

He drifted down to Fort Bliss, Tex., working from September 1, 1919, to October 15, 1919, as a cook at $40 per week, and again from March 1, 1920, to November 15, 1920, at the same wage. On December 21, 1920, he reenlisted at Fort Bliss. Prior to his re-enlistment he was given a physical examination by Army surgeons, who certified that he "fulfills the physical and legal requirements for enlistment and is accepted."

In connection with this examination appellant in the presence of the examining officer signed a declaration in which he stated that he had not found that his health and habits in any way interfered with his success in civil life, and represented himself to be "sound and well." He was discharged from the Army on July 30, 1921, at Camp Sherman, Ohio. Prior to his discharge he was again examined by an Army medical officer and found "physically and mentally fit for duty." In the presence of his commanding officer and in connection with an official "report of physical examination prior to separation from service," appellant answered in the negative the following question: "Have you any reason to believe that at the present time you are suffering from the effects of any wound, injury, or disease, or that you have any disability or impairment of health whether or not incurred in the military service?" The examining surgeon certified that appellant had been given a careful physical examination, "and it is found that he is physically and mentally sound." He had enlisted for one year, but was discharged before the expiration of the year under the provisions of paragraph 148½, Army Regulations 1913. His commanding officer in the final endorsement on appellant's service record stated: "His character is poor."

On January 11, 1925, appellant was admitted to the Veterans' Hospital at Whipple Barracks, Ariz., and his condition was diagnosed: "Drug addiction, without psychosis, veronal. Alcoholism, chronic (without psychosis)." He was discharged on February 13, 1925, for "Disciplinary reasons (misconduct)."

On April 22, 1925, appellant was admitted to the Veterans' Hospital at North Little Rock, Ark., suffering from "Veronal poisoning, acute." He was discharged therefrom on May 23, 1925, when "he was in perfectly good health except for chronic enlarged tonsils."

In the fall of 1926 appellant was examined by a consulting physician in neuropsychiatry at the Mt. Alto Veterans' Bureau Hospital in Washington, D. C., who testified that at the time of examination appellant, in the doctor's opinion, could continuously follow a substantially gainful occupation.

In February, 1927, appellant was admitted to the Veterans' Hospital at Gulfport, Miss. Upon his discharge on March 14th, following, it was certified that upon his admission "he was profoundly under the influence of veronal. * * * This patient is

essentially a constitutional psychopath. Whatever disability exists is due to his own misconduct. Note.—It is the opinion that this patient is competent."

On November 12, 1927, appellant was examined by a physician of the Veterans' Bureau at Little Rock, Ark. Appellant was confined in the city jail at that time for being drunk. The doctor testified (by deposition) that in his opinion plaintiff "could continuously follow a gainful occupation as a cook, or doing farm work, or working in a dairy, or doing any kind of common labor; * * * that the permanency of the plaintiff's condition depended upon whether or not the plaintiff wanted to quit drinking."

Appellant was not present at the trial, nor did he testify by deposition. There was medical testimony to the effect that there was no reason why he could not have attended the trial.

The depositions of three physicians were taken by appellant and introduced in evidence. Dr. Copenhaver, of Knoxville, Tenn., who knew appellant while he was in the service during the war and subsequently, testified that he examined appellant shortly after his discharge and that he was well developed physically and well nourished, "but seemed to have some nervous condition. * * * he didn't see the plaintiff any more for several years; that he seemed to be sort of a wanderer, going from one place to another."

Dr. Peters, of Knoxville, examined appellant while he was in the county jail in 1925, and found him to be suffering from "degenerated tendencies." Appellant "was nervous to some extent; that he appeared to be normal, and from history and the fact that he was in jail at that time, he appeared to be an incorrigible boy, a person who is hard to control by his parents; that subsequent thereto, witness examined the plaintiff on March 19, 1931, and found plaintiff at that time to be suffering from mental condition. * * * He may get better at times and worse at times." The doctor expressed the opinion "that the nervous and insane condition" of appellant would "likely continue throughout plaintiff's life." That, in the opinion of the doctor, appellant cannot continuously follow a substantially gainful occupation.

Dr. Smith, superintendent of the Eastern State Hospital, at Knoxville, Tenn., stated that appellant had entered the hospital on July 9, 1927, and remained for 23 days; was readmitted to the hospital on December 14, 1927, and left on January 23, 1928; was readmitted on April 3, 1931, and was discharged April 10, 1931. The doctor was of the opinion that appellant was brought to the hospital from the county jail. According to his diagnosis, appellant "is a dementia praecox of the paranoid type and that type of insanity rarely, if ever, improves." The doctor did not know when appellant's insane condition began to manifest itself; that the first time he ever saw appellant was July 9, 1927; "that he didn't attempt to say or testify as to his condition before that time, either mental or physical, and that he couldn't say and that he didn't attempt to say that the plaintiff's service in the World War was the cause of his condition when he saw him in 1927."

Dr. Shea, who graduated from a medical school in 1929, and who first saw appellant subsequent to that time, testified for plaintiff at the trial that, according to his diagnosis, "Atkins was suffering from dementia praecox, type of insanity; that there was no cure for such disease; * * * that in his opinion, Atkins was totally and permanently disabled."

The decision of the Supreme Court of the United States in Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 273, 78 L. Ed. 492, is apposite. Lumbra's policy lapsed May 31, 1919. He brought suit on November 30, 1931, alleging that before the policy lapsed he had become permanently disabled by reason of "recurring spells of headache, dizziness, epileptic seizures, and other illness." There was medical opinion evidence in behalf of Lumbra, the court ruled, "sufficient to sustain a finding that petitioner's illness before and after the lapse of the policy resulted from injuries and exposure while in the military service, and that the epileptiform and epileptic fits, such as that suffered March 1, 1923, and later, are not curable." "It requires no discussion," said the court, "to show that the evidence in respect of petitioner's condition during the life of the policy has no substantial tendency to prove total permanent disability at the time of the lapse. The evidence as to his subsequent condition may be considered only for the purpose of determining his condition while the contract was in force. His conduct following the alleged accrual of his claim reflects his own opinion as to whether he was totally and permanently disabled at the time of the lapse. His own statements to medical men, their diagnoses, his repeated applications to the government for compensation, and his failure earlier to assert any

claim, show that for a decade he did not believe that he was totally and permanently disabled when he let his policy lapse May 31, 1919. And in the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed."

The court concluded that the trial court should have directed a verdict for the United States, and therefore affirmed the decision of the Circuit Court of Appeals that had reached the same conclusion.

In the present case there is no substantial evidence connecting Atkins' present condition with his military service prior to the lapsing of the policy. He was apparently able to work and did work until his habits interfered. A strong circumstance not present in the Lumbra Case is the reenlistment twenty months later. It is inconceivable that he could have been accepted for this service had he not been reasonably sound in body and mind.

We have examined appellant's altogether too numerous assignments of error, but we do not deem it necessary to discuss them. Suffice it to say that no prejudicial error occurred. While the case was submitted to the jury in a comprehensive and fair charge, the court would have been justified, under the ruling in the Lumbra Case, in directing a verdict for the United States.

Judgment affirmed.

Affirmed.