## GALLOWAY *v.* UNITED STATES.

No. 553. Argued March 9, 1943.—Decided May 24, 1943.

*Mr. Warren E. Miller* for petitioner.

*Mr. Lester P. Schoene,* with whom *Solicitor General Fahy, Assistant Attorney General Shea,* and *Messrs. Wilbur C. Pickett, W. Marvin Smith,* and *Keith L. Seegmiller* were on the brief, for the United States.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Petitioner seeks benefits for total and permanent disability by reason of insanity he claims existed May 31, 1919. On that day his policy of yearly renewable term insurance lapsed for nonpayment of premium.[1]

---

[1] The contract was issued pursuant to the War Risk Insurance Act and insured against death or total permanent disability. (Act of Oct.

The suit was filed June 15, 1938. At the close of all the evidence, the District Court granted the Government's motion for a directed verdict. Judgment was entered accordingly. The Circuit Court of Appeals affirmed. 130 F. 2d 467. Both courts held the evidence legally insufficient to sustain a verdict for petitioner. He says this was erroneous and, in effect, deprived him of trial by jury, contrary to the Seventh Amendment.

The constitutional argument, as petitioner has made it, does not challenge generally the power of federal courts to withhold or withdraw from the jury cases in which the claimant puts forward insufficient evidence to support a verdict.[2] The contention is merely that his case as made was substantial, the courts' decisions to the contrary were wrong, and therefore their effect has been to deprive him of a jury trial. Petitioner relies particularly upon *Halliday* v. *United States*, 315 U. S. 94, and *Berry* v. *United States*, 312 U. S. 450, citing also *Gunning* v. *Cooley*, 281 U. S. 90. These cases and others relied upon are distinguishable upon the facts, as will appear. Upon the record and the issues as the parties have made them, the only question is whether the evidence was sufficient to sustain a verdict for petitioner. On that basis, we think the judgments must be affirmed.

## I.

Certain facts are undisputed. Petitioner worked as a longshoreman in Philadelphia and elsewhere prior to en-

6, 1917, c. 105, § 400, 40 Stat. 398, 409.) Pursuant to statutory authority (Act of May 20, 1918, c. 77, § 13, 40 Stat. 555), T. D. 20 W. R., promulgated March 9, 1918, provided:

"Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed . . . to be total disability.

"Total disability shall be deemed to be permanent whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it. . . ." (Regulations and Procedure, U. S. Veterans Bureau, Part I, p. 9.)

[2] See, however, Part III, *infra*.

listment in the Army November 1, 1917.[3] He became a cook in a machine gun battalion. His unit arrived in France in April, 1918. He served actively until September 24. From then to the following January he was in a hospital with influenza. He then returned to active duty. He came back to the United States, and received honorable discharge April 29, 1919. He enlisted in the Navy January 15, 1920, and was discharged for bad conduct in July. The following December he again enlisted in the Army and served until May 1922, when he deserted. Thereafter he was carried on the Army records as a deserter.

In 1930 began a series of medical examinations by Veterans' Bureau physicians. On May 19 that year his condition was diagnosed as "Moron, low grade; observation, dementia praecox, simple type." In November, 1931, further examination gave the diagnosis, "Psychosis with other diseases or conditions (organic disease of the central nervous system—type undetermined)." In July, 1934, still another examination was made, with diagnosis: "Psychosis-manic and depressive insanity incompetent; hypertension, moderate; otitis media, chronic, left; varicose veins left, mild; abscessed teeth roots; myocarditis, mild."

Petitioner's wife, the nominal party in this suit, was appointed guardian of his person and estate in February, 1932. Claim for insurance benefits was made in June, 1934, and was finally denied by the Board of Veterans' Appeals in January, 1936. This suit followed two and a half years later.

Petitioner concededly is now totally and permanently disabled by reason of insanity and has been for some time prior to institution of this suit. It is conceded also that

---

[3] The record does not show whether this employment was steady and continuous or was spotty and erratic. But there is no contention petitioner's behavior was abnormal before he arrived in France in April, 1918.

he was sound in mind and body until he arrived in France in April, 1918.

The theory of his case is that the strain of active service abroad brought on an immediate change, which was the beginning of a mental breakdown that has grown worse continuously through all the later years. Essential in this is the view it had become a total and permanent disability not later than May 31, 1919.

The evidence to support this theory falls naturally into three periods, namely, that prior to 1923; the interval from then to 1930; and that following 1930. It consists in proof of incidents occurring in France to show the beginnings of change; testimony of changed appearance and behavior in the years immediately following petitioner's return to the United States as compared with those prior to his departure; the medical evidence of insanity accumulated in the years following 1930; and finally the evidence of a physician, given largely as medical opinion, which seeks to tie all the other evidence together as foundation for the conclusion, expressed as of 1941, that petitioner's disability was total and permanent as of a time not later than May of 1919.

Documentary exhibits included military, naval and Veterans' Bureau records. Testimony was given by deposition or at the trial chiefly by five witnesses. One, O'Neill, was a fellow worker and friend from boyhood; two, Wells and Tanikawa, served with petitioner overseas; Lt. Col. Albert K. Mathews, who was an Army chaplain, observed him or another person of the same name at an Army hospital in California during early 1920; and Dr. Wilder, a physician, examined him shortly before the trial and supplied the only expert testimony in his behalf. The petitioner also put into evidence the depositions of Commander Platt and Lt. Col. James E. Matthews, his superior officers in the Navy and the Army, respectively, during 1920–22.

What happened in France during 1918–19 is shown chiefly by Wells and Tanikawa. Wells testified to an incident at Aisonville, where the unit was billeted shortly after reaching France and before going into action. Late at night petitioner created a disturbance, "hollering, screeching, swearing. . . . The men poured out from the whole section." Wells did not see the incident, but heard petitioner swearing at his superior officers and saw "the result, a black eye for Lt. Warner." However, he did not see "who gave it to him."[4] Wells personally observed no infraction of discipline except this incident, and did not know what brought it on. Petitioner's physical appearance was good, he "carried on his duties as a cook all right," and the witness did not see him after June 1, except for about three days in July when he observed petitioner several times at work feeding stragglers.

Tanikawa, Hawaiian-born citizen, served with petitioner from the latter's enlistment until September, 1918, when Galloway was hospitalized, although the witness thought they had fought together and petitioner was "acting queer" at the Battle of the Argonne in October. At Camp Greene, North Carolina, petitioner was "just a regular soldier, very normal, . . . pretty neat." After reaching France "he was getting nervous . . ., kind of irritable, always picking a fight with other soldiers." This began at Aisonville. Tanikawa saw Galloway in jail, apparently before June. It is not clear whether these are references to the incident Wells described.

Tanikawa described another incident in June "when we were on the Marne," the Germans "were on the other side and we were on this side." It was a new front, without trenches. The witness and petitioner were on guard duty with others. Tanikawa understood the Germans

---

[4] Wells heard of another incident at Monthurel in June, but his testimony concerning this was excluded as hearsay.

were getting ready for a big drive. "One night he [petitioner] screamed. He said, 'The Germans are coming' and we all gagged him." There was no shooting, the Germans were not coming, and there was nothing to lead the witness to believe they were. Petitioner was court-martialed for the matter, but Tanikawa did not know "what they did with him." He did not talk with Galloway that night, because "he was out of his mind" and appeared insane. Tanikawa did not know when petitioner left the battalion or what happened to him after (as the witness put it) the Argonne fight, but heard he went to the hospital, "just dressing station I guess." The witness next saw Galloway in 1936, at a disabled veterans' post meeting in Sacramento, California. Petitioner then "looked to me like he wasn't all there. Insane. About the same . . . as compared to the way he acted in France, particularly when they gagged him . . ."

O'Neill was "born and raised with" petitioner, worked with him as a longshoreman, and knew him "from when he come out of the army for seven years, . . . I would say five or six years." When petitioner returned in April or ·May, 1919, "he was a wreck compared to what he was when he went away. The fallow's mind was evidently unbalanced." Symptoms specified were withdrawing to himself; crying spells; alternate periods of normal behavior and nonsensical talk; expression of fears that good friends wanted "to beat him up"; spitting blood and remarking about it in vulgar terms. Once petitioner said, "G— d— it, I must be a Doctor Jekyll and Mr. Hyde."

O'Neill testified these symptoms and this condition continued practically the same for about five years. In his opinion petitioner was "competent at times and others was incompetent." The intervals might be "a couple of days, a couple of months." In his normal periods Galloway "would be his old self . . . absolutely O. K."

O'Neill was definite in recalling petitioner's condition and having seen him frequently in 1919, chiefly however, and briefly, on the street during lunch hour. He was not sure Galloway was working and was "surprised he got in the Navy, I think in the Navy or in the Government service."

O'Neill maintained he saw petitioner "right on from that [1920] at times." But his recollection of dates, number of opportunities for observation, and concrete events was wholly indefinite. He would fix no estimate for the number of times he had seen petitioner: "In 1920 I couldn't recall whether it was one or a thousand." For later years he would not say whether it was "five times or more or less." When he was pinned down by cross-examination, the effect of his testimony was that he recalled petitioner clearly in 1919 "because there was such a vast contrast in the man," but for later years he could give little or no definite information. The excerpt from the testimony set forth in the margin [5] shows this con-

---

[5] "X Can you tell us approximately how many times you saw him in 1919?

"A. No; I seen him so often that it would be hard to give any estimate.

"X And the same goes *for 1920?*

"A. *I wouldn't be sure about 1920. I remember him more when he first came home because there was such a vast contrast in the man.* Otherwise, if nothing unusual happened, I wouldn't probably recall him at all, you know, that is, recall the particular time and all.

"X Well, do you recall him *at all in 1920?*

"A. *I can't say.*

"X And could you swear whether or not you ever saw him *in 1921?*

"A. I think I seen him both in 1921 and 1920 and 1921 and right on. I might not see him for a few weeks or months at a time, but I think I saw him a few times in all the years right up to, as I say, at least five years after.

"X Can you give us *an estimate* as to the number of times you saw him *in 1920?*

"A. *No, I would not.*

"X Was it *more than five times or less?*

trast. We also summarize below [6] other evidence which explains or illustrates the vagueness of the witness' recollection for events after 1919. O'Neill recalled one specific occasion after 1919 when petitioner returned to Philadelphia, "around 1920 or 1921, but I couldn't be sure," to testify in a criminal proceeding. He also said, "After he was away for five or six years, he came back to Philadelphia, but I wouldn't know nothing about dates on that. He was back in Philadelphia for five or six months or so, and he was still just evidently all right, and then he would be off."

Lt. Col. (Chaplain) Mathews said he observed a Private Joseph Galloway, who was a prisoner for desertion and a patient in the mental ward at Fort MacArthur Sta-

---

"A. In 1920 *I couldn't recall whether it was one or a thousand. The time I recall him well is when he first come home,* but I know that I seen him right on from that at times.

"X And the same goes for 1921, 1922, 1923 and 1924?

"A. I would say for five years afterwards, but I don't know just when or how often I seen him except when he first come home for the first couple of months.

"X *But for years after his return you couldn't say definitely whether you saw him five times or more or less, could you?*

"A. *No,* because it was a thing that *there was a vast contrast when he first come home* and everybody noticed it and remarked about it and it was more liable to be remembered. You could ask me about some more friends I knew during those years and I wouldn't know except there was something unusual." (Emphasis added.)

[6] Petitioner's own evidence shows without dispute he was on active duty in the Navy from January 15, 1920, to July of that year, and in the Army from December, 1920, to May 6, 1922. As is noted in the text, O'Neill was not sure he was working and "was surprised he got in the Navy, I think in the Navy or in the Government service." He only "heard some talk" of petitioner's having reënlisted in the Army, but *"if it was the fact,* I would be surprised that he could do it owing to his mental condition." (Emphasis added.) O'Neill was not certain that he saw Galloway in uniform after the first week of his return to Philadelphia from overseas, although he said he saw petitioner during "the periods of those reënlistments . . . but I can't recall about it."

tion Hospital, California, during a six weeks period early in 1920. The chaplain's testimony gives strong evidence the man he observed was insane. However, there is a fatal weakness in this evidence. In his direct testimony, which was taken by deposition, the chaplain said he was certain that the soldier was petitioner. When confronted with the undisputed fact that petitioner was on active duty in the Navy during the first half of 1920, the witness at first stated that he might have been mistaken as to the time of his observation. Subsequently he reasserted the accuracy of his original statement as to the time of observation, but admitted that he might have been mistaken in believing that the patient-prisoner was petitioner. In this connection he volunteered the statement, "Might I add, sir, that I could not now identify that soldier if I were to meet him face to face, and that is because of the long lapse of time." The patient whom the witness saw was confined to his bed. The record is barren of other evidence, whether by the hospital's or the Army's records or otherwise, to show that petitioner was either patient or prisoner at Fort MacArthur in 1920 or at any other time.

Commander Platt testified that petitioner caused considerable trouble by disobedience and leaving ship without permission during his naval service in the first half of 1920. After "repeated warnings and punishments, leading to courts martial," he was sentenced to a bad conduct discharge.

Lt. Col. James E. Matthews (not the chaplain) testified by deposition which petitioner's attorney interrupted Dr. Wilder's testimony to read into evidence. The witness was Galloway's commanding officer from early 1921 to the summer of that year, when petitioner was transferred with other soldiers to another unit. At first, Colonel Matthews considered making petitioner a corporal, but found him unreliable and had to discipline him. Petitioner "drank

considerably," was "what we called a bolshevik," did not seem loyal, and "acted as if he was not getting a square deal." The officer concluded "he was a moral pervert and probably used narcotics," but could not secure proof of this. Galloway was court-martialed for public drunkenness and disorderly conduct, served a month at hard labor, and returned to active duty. At times he "was one of the very best soldiers I had," at others undependable. He was physically sound, able to do his work, perform close order drill, etc., "very well." He had alternate periods of gaiety and depression, talked incoherently at times, gave the impression he would fight readily, but did not resent orders and seemed to get along well with other soldiers. The officer attributed petitioner's behavior to alcohol and narcotics, and it occurred to him at no time to question his sanity.

Dr. Wilder was the key witness. He disclaimed specializing in mental disease, but qualified as having given it "special attention." He first saw petitioner shortly before the trial, examined him "several times." He concluded petitioner's ailment "is a schizophrenic branch or form of praecox." Dr. Wilder heard the testimony and read the depositions of the other witnesses, and examined the documentary evidence. Basing his judgment upon this material, with inferences drawn from it, he concluded petitioner was born with "an inherent instability," though he remained normal until he went to France; began there "to be subjected to the strain of military life, then he began to go to pieces." In May, 1919, petitioner "was still suffering from the acuteness of the breakdown . . . He is going down hill still, but the thing began with the breakdown . . ." Petitioner was "definitely insane, yes, sir," in 1920 and "has been insane at all times, at least since July, 1918, the time of this episode on the Marne"; that is, "to the point that he was unable to adapt himself. I don't mean he has not had moments when he could not [*sic*] perform some routine tasks," but "from an occupa-

tional standpoint . . . he has been insane." He could follow "a mere matter of routine," but would have no incentive, would not keep a steady job, come to work on time, or do anything he didn't want to do. Dr. Wilder pointed to petitioner's work record before he entered the service and observed: "At no time after he went into the war do we find him able to hold any kind of a job. He broke right down." He explained petitioner's enlistment in the Navy and later in the Army by saying, "It would have been no trick at all *for a man who was reasonably conforming* to get into the Service." (Emphasis added.)

However, the witness knew "nothing whatever except his getting married" about petitioner's activities between 1925 and 1930, and what he knew of them between 1922 and 1925 was based entirely on O'Neill's testimony and a paper not of record here.[7] Dr. Wilder at first regarded knowledge concerning what petitioner was doing between 1925 and 1930 as not essential. "We have a continuing disease, quite obviously beginning during his military service, and quite obviously continuing in 1930, and *the minor incidents* don't seem to me——" (Emphasis added.) Counsel for the government interrupted to inquire, "Well, if he was continuously employed for eight hours a day from 1925 to 1930 would that have any bearing?" The witness replied, "It would have a great deal." Upon further questioning, however, he reverted to his first position, stating it would not be necessary or helpful for him to know what petitioner was doing from 1925 to 1930: "I testified from the information I had."

## II.

This, we think, is the crux of the case and distinguishes it from the cases on which petitioner has relied.[8] His bur-

---

[7] It is to be noted the witness did not refer to Chaplain Mathews' testimony.

[8] None of them exhibits a period of comparable length as to which evidence is wholly lacking and under circumstances which preclude inference the omission was unintentional.

den was to prove total and permanent disability as of a date not later than May 31, 1919. He has undertaken to do this by showing incipience of mental disability shortly before that time and its continuance and progression throughout the succeeding years. He has clearly established incidence of total and permanent disability as of some period prior to 1938, when he began this suit.[9] For our purposes this may be taken as medically established by the Veterans' Bureau examination and diagnosis of July, 1934.[10]

But if the record is taken to show that some form of mental disability existed in 1930, which later became total and permanent, petitioner's problem remains to demonstrate by more than speculative inference that this condition itself began on or before May 31, 1919, and con-

---

[9] He has not established a fixed date at which contemporaneous medical examination, both physical and mental, establishes totality and permanence prior to Dr. Wilder's examinations in 1941.

Dr. Wilder testified that on the evidence concerning petitioner's behavior at the time of his discharge in 1919, and without reference to the testimony as to later conduct, including O'Neill's, he would reserve his opinion on whether petitioner was then "crazy"—"I wouldn't have enough—"

[10] The previous examinations of 1930 and 1931 show possibility of mental disease in the one case and existence of psychosis with other disease, organic in character but with type undetermined, in the other. These two examinations without more do not prove existence of total and permanent disability; on the contrary, they go far toward showing it could not be established then medically.

The 1930 diagnosis shows only that the examiner regarded petitioner as a moron of low grade, and recommended he be observed for simple dementia praecox. Dr. Wilder found no evidence in 1941 that petitioner was a moron. The 1931 examination is even less conclusive in one respect, namely, that "psychosis" takes the place of moronic status. Dr. Wilder also disagreed with this diagnosis. However, this examination first indicates existence of organic nervous disease. Not until the 1934 diagnosis is there one which might be regarded as showing possible total and permanent disability by medical evidence contemporaneous with the fact.

tinuously existed or progressed through the intervening years to 1930.

To show origin before the crucial date, he gives evidence of two abnormal incidents occurring while he was in France, one creating the disturbance before he came near the fighting front, the other yelling that the Germans were coming when he was on guard duty at the Marne. There is no other evidence of abnormal behavior during his entire service of more than a year abroad.

That he was court-martialed for these sporadic acts and bound and gagged for one does not prove he was insane or had then a general breakdown in "an already fragile mental constitution," which the vicissitudes of a longshoreman's life had not been able to crack.

To these two incidents petitioner adds the testimony of O'Neill that he looked and acted like a wreck, compared with his former self, when he returned from France about a month before the crucial date, and O'Neill's vague recollections that this condition continued through the next two, three, four, or five years.

O'Neill's testimony apparently takes no account of petitioner's having spent 101 days in a hospital in France with influenza just before he came home. But, given the utmost credence, as is required, it does no more than show that petitioner was subject to alternating periods of gaiety and depression for some indefinite period after his return, extending perhaps as late as 1922. But because of its vagueness as to time, dates, frequency of opportunity for observation, and specific incident, O'Neill's testimony concerning the period from 1922 to 1925 is hardly more than speculative.

We have then the two incidents in France, followed by O'Neill's testimony of petitioner's changed condition in 1919 and its continuance to 1922.[11] There is also the

---

[11] Chaplain Mathews' testimony would be highly probative of insanity existing early in 1920, if petitioner were sufficiently identified as its subject. However, the bare inference of identity which might other-

testimony of Commander Platt and Lt. Col. James E. Matthews as to his service in the Navy and the Army, respectively, during 1920–1922. Neither thought petitioner was insane or that his conduct indicated insanity. Then follows a chasm of eight years. The only evidence [12] we have concerning this period is the fact that petitioner married his present guardian at some time within it, an act from which in the legal sense no inference of insanity can be drawn.

This period was eight years of continuous insanity, according to the inference petitioner would be allowed to have drawn. If so, he should have no need of inference. Insanity so long and continuously sustained does not hide itself from the eyes and ears of witnesses.[13] The assidu-

---

wise be drawn from the mere identity of names cannot be made reasonably, in view of its overwhelming contradiction by other evidence presented by petitioner and the failure to produce records from Fort MacArthur Hospital or the Army or from persons who knew the fact that petitioner had been there at any time. The omission eloquently testifies, in a manner which no inference could overcome, that petitioner never was there. The chaplain's testimony therefore should have been stricken, had the case gone to the jury, and petitioner can derive no aid from it here.

Tanikawa, it may be recalled, did not profess to have seen petitioner between October, 1918, and 1936.

[12] Apart from O'Neill's vague recollection of petitioner's return to Philadelphia on one occasion.

[13] The only attempt to explain the absence of testimony concerning the period from 1922 to 1930 is made by counsel in the reply brief: "The insured, it will be observed, was never apprehended after his desertion from the Army in 1922. It is only reasonable that a person with the status of a deserter at large . . ., whose mind was in the condition of that of this insured, would absent himself from those with whom he would usually associate because of fear of apprehension and punishment. His mental condition . . . at the time of trial . . . clearly shows that he could not have testified. . . . A lack of testimony from 1922 to 1930 is thus explained, and the jury could well infer that only the then [1941?] admittedly insane insured was in a position to know where he was and what he was doing during

ity which produced the evidence of two "crazy" incidents during a year and a half in France should produce one during eight years or, for that matter, five years in the United States.

Inference is capable of bridging many gaps. But not, in these circumstances, one so wide and deep as this. Knowledge of petitioner's activities and behavior from 1922 or 1925 to 1930 was peculiarly within his ken and that of his wife, who has litigated this cause in his and presumably, though indirectly, in her own behalf. His was the burden to show continuous disability. What he did in this time, or did not do, was vital to his case. Apart from the mere fact of his marriage, the record is blank for five years and almost blank for eight. For all that appears, he may have worked full time and continuously for five and perhaps for eight, with only a possible single interruption.[14]

No favorable inference can be drawn from the omission. It was not one of oversight or inability to secure proof. That is shown by the thoroughness with which the record was prepared for all other periods, before and after this one, and by the fact petitioner's wife, though she married him during the period and was available, did not testify. The only reasonable conclusion is that petitioner, or those who acted for him, deliberately chose, for reasons no doubt considered sufficient (and which we do not criticize, since

---

these years; as he had lost his mental faculties, the reason for lack of proof during these years is apparent."

The "explanation" is obviously untenable. It ignores the one fact proved with relation to the period, that petitioner was married during it. His wife was nominally a party to the suit, and obviously available as a witness. It disregards the fact petitioner continued in the status of deserter after 1930, yet produced evidence relating to the period from that time on. It assumes he was insane during the eight years, yet succeeded during that long time in absenting himself from persons who could testify in his favor.

[14] *Cf.* note 12, *supra.*

such matters, including tactical ones, are for the judgment of counsel), to present no evidence or perhaps to withhold evidence readily available concerning this long interval, and to trust to the genius of expert medical inference and judicial laxity to bridge this canyon.

In the circumstances exhibited, the former is not equal to the feat, and the latter will not permit it. No case has been cited and none has been found in which inference, however expert, has been permitted to make so broad a leap and take the place of evidence which, according to all reason, must have been at hand.[15] To allow this would permit the substitution of inference, tenuous at best, not merely for evidence absent because impossible or difficult to secure, but for evidence disclosed to be available and not produced. This would substitute speculation for proof. Furthermore, the inference would be more plausible perhaps if the evidence of insanity as of May, 1919, were stronger than it is, such for instance as Chaplain Mathews' testimony would have furnished if it could be taken as applying to petitioner. But, on this record, the evidence of insanity as of that time is thin at best, if it can be regarded as at all more than speculative.[16]

Beyond this, there is nothing to show totality or permanence. These come only by what the Circuit Court of Appeals rightly characterized as "long-range retroactive diagnosis." That might suffice, notwithstanding this crucial inference was a matter of opinion, if there were factual evidence over which the medical eye could travel and find continuity through the intervening years. Cf. *Halliday* v. *United States, supra.* But eight years are too many to permit it to skip, when the bridgeheads (if the figure may be changed) at each end are no stronger than

---

[15] Compare *Bishop* v. *Copp,* 96 Conn. 571, 580, 114 A. 682; *Murphree* v. *Senn,* 107 Ala. 424, 18 So. 264; *Aldrich* v. *Aldrich,* 215 Mass. 164, 102 N. E. 487.

[16] *Cf.* Dr. Wilder's admission, note 9, *supra.*

they are here, and when the seer first denies, then admits, then denies again, that what took place in this time would make "a great deal" of difference in what he saw. Expert medical inference rightly can do much. But we think the feat attempted here too large for its accomplishment.

The Circuit Court of Appeals thought petitioner's enlistments and service in the Navy and Army in 1920–1922 were in themselves "such physical facts as refute any reasonable inferences which may be drawn from the evidence here presented by him that he was *totally* and *permanently* disabled during the life of his policy." 130 F. 2d 471; cf. *Atkins* v. *United States,* 63 App. D. C. 164, 70 F. 2d 768, 771; *United States* v. *Le Duc,* 48 F. 2d 789, 793 (C. C. A.). The opinion also summarizes and apparently takes account of the evidence presented on behalf of the Government. 130 F. 2d 469, 470. In view of the ground upon which we have placed the decision, we need not consider these matters.

### III.

What has been said disposes of the case as the parties have made it. For that reason perhaps nothing more need be said. But objection has been advanced that, in some manner not wholly clear, the directed verdict practice offends the Seventh Amendment.

It may be noted, first, that the Amendment has no application of its own force to this case. The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign.[17] Whatever force the

[17] Neither the Amendment's terms nor its history suggest it was intended to extend to such claims. The Court of Claims has functioned for almost a century without affording jury trial in cases of this sort and without offending the requirements of the Amendment. *McElrath* v. *United States,* 102 U. S. 426; see Richardson, History, Jurisdic-

Amendment has therefore is derived because Congress, in the legislation cited,[18] has made it applicable. Even so, the objection made on the score of its requirements is untenable.

If the intention is to claim generally that the Amendment deprives the federal courts of power to direct a verdict for insufficiency of evidence, the short answer is the contention has been foreclosed by repeated decisions made here consistently for nearly a century.[19] More recently the practice has been approved explicitly in the promulgation of the Federal Rules of Civil Procedure. Cf. Rule 50; *Berry* v. *United States,* 312 U. S. 450. The objection therefore comes too late.

Furthermore, the argument from history is not convincing. It is not that "the rules of the common law" in 1791 deprived trial courts of power to withdraw cases from the

tion and Practice of the Court of Claims (2d ed. 1885). *Cf.* also note 18, *infra.*

[18] 43 Stat. 1302, 38 U. S. C. § 445; see H. R. Rep. No. 1518, 68th Cong., 2d Sess., 2; *Pence* v. *United States,* 316 U. S. 332, 334; *Whitney* v. *United States,* 8 F. 2d 476 (C. C. A.); *Hacker* v. *United States,* 16 F. 2d 702 (C. C. A.).

Although Congress, in first permitting suits on War Risk Insurance policies, did not explicitly make them triable by jury, 40 Stat. 398, 410, the statute was construed to import "the usual procedure . . . in actions at law for money compensation." *Law* v. *United States,* 266 U. S. 494, 496. In amending that Act, Congress provided that, except for differences not relevant here, the "procedure in such suits shall . . . be the same as that provided for suits" under the Tucker Act, 43 Stat. 607, 613. Suits under the Tucker Act were tried without a jury (24 Stat. 505). However, within a year (in 1925) Congress amended that Act (43 Stat. 1302) with the intention to "give the claimant the right to a jury trial." H. R. Rep. No. 1518, 68th Cong., 2d Sess., 2.

[19] See *e. g., Parks* v. *Ross,* 11 How. 362; *Improvement Co.* v. *Munson,* 14 Wall. 442; *Pleasants* v. *Fant,* 22 Wall. 116; *Commissioners of Marion County* v. *Clark,* 94 U. S. 278; *Ewing* v. *Goode,* 78 F. 442 (C. C.); *cf. Southern Ry. Co.* v. *Walters,* 284 U. S. 190; *Gunning* v. *Cooley,* 281 U. S. 90.

jury, because not made out, or appellate courts of power to review such determinations. The jury was not absolute master of fact in 1791. Then as now courts excluded evidence for irrelevancy and relevant proof for other reasons.[20] The argument concedes they weighed the evidence, not only piecemeal but *in toto* for submission to the jury, by at least two procedures, the demurrer to the evidence and the motion for a new trial. The objection is not therefore to the basic thing,[21] which is the power of the court to withhold cases from the jury or set aside the verdict for insufficiency of the evidence. It is rather to incidental or collateral effects, namely, that the directed verdict as now administered differs from both those procedures because, on the one hand, allegedly higher standards of proof are required and, on the other, different consequences follow as to further maintenance of the litigation. Apart from the standards of proof, the argument appears to urge that in 1791, a litigant could challenge his opponent's evidence, either by the demurrer, which when determined ended the litigation, or by motion for a new trial which, if successful, gave the adversary another chance to prove his case; and therefore the Amendment excluded any challenge to which one or the other of these consequences does not attach.

The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing.[22] Nor were "the rules of the

---

[20] Compare, *e. g.*, 3 Gilbert, The Law of Evidence (1792) 1181–5; *Rex* v. *Paine*, 5 Mod. 163; *Folkes* v. *Chadd*, 3 Doug. 157.

[21] *Cf. Thoe* v. *Chicago, M. & St. P. Ry. Co.*, 181 Wis. 456, 195 N. W. 407.

[22] *Ex parte Peterson*, 253 U. S. 300; *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U. S. 494; *Walker* v. *New Mexico & Southern Pacific R. Co.*, 165 U. S. 593; *Capital Traction Co.* v. *Hof*, 174 U. S. 1; *cf.* Stone, J., dissenting in *Dimick* v. *Schiedt*, 293 U. S. 474.

common law" then prevalent, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystallized in a fixed and immutable system. On the contrary, they were constantly changing and developing during the late eighteenth and early nineteenth centuries.[23] In 1791 this process already had

490. The rules governing the admissibility of evidence, for example, have a real impact on the jury's function as a trier of facts and the judge's power to impinge on that function. Yet it would hardly be maintained that the broader rules of admissibility now prevalent offend the Seventh Amendment because at the time of its adoption evidence now admitted would have been excluded. *Cf. e. g., Funk* v. *United States,* 290 U. S. 371.

[23] *E. g.,* during the eighteenth and nineteenth centuries, the nonsuit was being transformed in practice from a device by which a plaintiff voluntarily discontinued his action in order to try again another day into a procedure by which a defendant could put in issue the sufficiency of the plaintiff's evidence to go to the jury, differing from the directed verdict in that respect only in form. Compare Blackstone's Commentaries, Book III (Cooley's ed., 1899) 376; Johnson, J., dissenting in *Elmore* v. *Grymes,* 1 Pet. 469 (1828); *Oscanyan* v. *Winchester Arms Co.,* 103 U. S. 261, 264; *Coughran* v. *Bigelow,* 164 U. S. 301; see the historical survey in the comprehensive opinion of McAllister, J., in *Hopkins* v. *Railroad,* 96 Tenn. 409, 34 S. W. 1029. See generally 2 Tidd's Practice (4th Amer. ed., 1856) 861, 866–8. The nonsuit, of course, differed in consequence from the directed verdict, for it left the plaintiff free to try again. *Oscanyan* v. *Winchester Arms Co., supra;* Tidd's Practice, *supra.*

Similarly the demurrer to the evidence practice was not static during this period, as a comparison of *Cocksedge* v. *Fanshaw,* 1 Doug. 118 (1779), with *Gibson* v. *Hunter,* 2 H. Bl. 187 (1793), and the American practice on the demurrer to the evidence reveals (see, *e. g., Stephens* v. *White,* 2 Wash. 203 (Va. 1796); *Patrick* v. *Hallett,* 1 Johns. 241 (N. Y. 1806); *Whittington* v. *Christian,* 2 Randolph 353 (Va. 1824). See, generally, Schofield, New Trials and the Seventh Amendment, 8 Ill. L. Rev. 287, 381, 465; Thayer, Preliminary Treatise on Evidence (1898) 234–9). Nor was the conception of directing a verdict entirely unknown to the eighteenth century common law . See, *e. g., Wilkinson* v. *Kitchin,* 1 Ld. Raymond 89 (K. B.); *Syderbottom* v. *Smith,* 1 Strange 649. While there is no reason to believe that the notion at that time

resulted in widely divergent common-law rules on procedural matters among the states, and between them and England.[24] And none of the contemporaneous rules regarding judicial control of the evidence going to juries or its sufficiency to support a verdict had reached any precise, much less final, form.[25] In addition, the passage of time has obscured much of the procedure which then may have had more or less definite form, even for historical purposes.[26]

This difficulty, no doubt, accounts for the amorphous character of the objection now advanced, which insists, not that any single one of the features criticized, but that the cumulative total or the alternative effect of all, was embodied in the Amendment. The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions.[27]

Apart from the uncertainty and the variety of conclusion which follows from an effort at purely historical accuracy, the consequences flowing from the view asserted are sufficient to refute it. It may be doubted that the Amendment requires challenge to an opponent's case to be made without reference to the merits of one's own and at the price of all opportunity to have it considered. On the other hand, there is equal room for disbelieving it

---

even approximated in character the present directed verdict, the cases serve further to show the plastic and developing character of these procedural devices during the eighteenth and nineteenth centuries.

[24] See, *e. g.,* Quincy's Mass. Reports, 553–72.

[25] See note 23, *supra.*

[26] See, *e. g.,* Schofield, New Trials and the Seventh Amendment, 8 Ill. L. Rev. 287, 381, 465.

[27] *Cf.* notes 22 and 23, *supra.*

compels endless repetition of litigation and unlimited chance, by education gained at the opposing party's expense, for perfecting a case at other trials. The essential inconsistency of these alternatives would seem sufficient to refute that either or both, to the exclusion of all others, received constitutional sanctity by the Amendment's force. The first alternative, drawn from the demurrer to the evidence, attributes to the Amendment the effect of forcing one admission because another and an entirely different one is made,[28] and thereby compels conclusion of the litigation once and for all. The true effect of imposing such a risk would not be to guarantee the plaintiff a jury trial. It would be rather to deprive the defendant (or the plaintiff if he were the challenger) of that right; or, if not that, then of the right to challenge the legal sufficiency of the opposing case. The Amendment was not framed or adopted to deprive either party of either right. It is impartial in its guaranty of both. To posit assertion of one upon sacrifice of the other would dilute and distort the full protection intended. The admitted validity of the practice on the motion for a new trial goes far to demonstrate this.[29] It negatives any idea

---

[28] By conceding the full scope of an opponent's evidence and asserting its insufficiency in law, which is one thing, the challenger must be taken, perforce the Amendment, also to admit he has no case, if the other's evidence is found legally sufficient, which is quite another thing. In effect, one must stake his case, not upon its own merit on the facts, but on the chance he may be right in regarding his opponent as wanting in probative content. If he takes the gamble and loses, he pays with his own case, regardless of its merit and without opportunity for the jury to consider it. To force this choice and yet deny that afforded by the directed verdict would be to imbed in the Constitution the hyper-technicality of common-law pleading and procedure in their heyday. Cf. note 22, supra.

[29] Under that practice the moving party receives the benefit of jury evaluation of his own case and of challenge to his opponent's for insufficiency. If he loses on the challenge, the litigation is ended. But

that the challenge must be made at such a risk as the demurrer imposed. As for the other alternative, it is not urged that the Amendment guarantees another trial whenever challenge to the sufficiency of evidence is sustained. Cf. *Berry* v. *United States, supra.* That argument, in turn, is precluded by the practice on demurrer to the evidence.

Each of the classical modes of challenge, therefore, disproves the notion that the characteristic feature of the other, for effect upon continuing the litigation, became a part of the Seventh Amendment's guaranty to the exclusion of all others. That guaranty did not incorporate conflicting constitutional policies, that challenge to an opposing case must be made with the effect of terminating the litigation finally and, at the same time, with the opposite effect of requiring another trial. Alternatives so contradictory give room, not for the inference that one or the other is required, but rather for the view that neither is essential.[30]

---

this is not because, in making it, he is forced to admit his own is insufficient. It is rather for the reasons that the court finds the opposite party's evidence is legally sufficient and the jury has found it outweighs his own. There is thus no forced surrender of one right from assertion of another.

On the other hand, if the challenger wins, there is another trial. But this is because he has sought it, not because the Amendment guarantees it.

[30] We have not given special consideration to the latest decisions touching the Amendment's effects in the different situations where a verdict has been taken, on the one hand, without reservation of the question of the sufficiency of the evidence, *Slocum* v. *New York Life Ins. Co.,* 228 U. S. 364, and, on the other hand, with such a reservation, *Baltimore & Carolina Line* v. *Redman,* 295 U. S. 654. Cf. *Aetna Ins. Co.* v. *Kennedy,* 301 U. S. 389. Whatever may be the exact effect of the latter and, more recently, of Rule 50 of the Federal Rules of Civil Procedure upon the former decision, it suffices to say that, notwithstanding the sharp division engendered in the Slocum case, there was no disagreement in it or in the Redman case concerning the validity

Finally, the objection appears to be directed generally at the standards of proof judges have required for submission of evidence to the jury. But standards, contrary to the objection's assumption, cannot be framed wholesale for the great variety of situations in respect to which the question arises.[31] Nor is the matter greatly aided by substituting one general formula for another. It hardly affords help to insist upon "substantial evidence" rather than "some evidence" or "any evidence," or vice versa. The matter is essentially one to be worked out in particular situations and for particular types of cases. Whatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked. The mere difference in labels used to describe this standard, whether it is applied under the demurrer to the evidence [32] or on motion for a directed verdict, cannot amount to a departure from "the rules of the common law" which the Amendment requires to be followed.[33] If there is abuse in this respect, the obvious remedy is by correction on appellate review.

---

of the practice of directing a verdict. On the contrary, the opinions make it plain that this was unquestioned and in fact conceded by all.

[31] *Cf.* 9 Wigmore, Evidence (1940) 296–299.

[32] *Cf. e. g. Fowle* v. *Alexandria,* 11 Wheat. 320, 323 (1826), a demurrer to the evidence admits "whatever the jury may reasonably infer from the evidence." *Pawling* v. *United States,* 4 Cranch 219, 221–222 (1808). A demurrant to the evidence admits "the truth of the testimony to which he demurs and also those conclusions of fact which a jury may fairly draw from that testimony. Forced and violent inferences he does not admit; but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw, the court ought to draw." *Cocksedge* v. *Fanshaw, supra; Patrick* v. *Hallett, supra; Stephens* v. *White, supra.* ·

[33] *Cf.* Hughes, J., dissenting in *Slocum* v. *New York Life Ins.· Co..* 228 U. S. 364, 408, and cases cited *supra,* note 22.

Judged by this requirement, or by any standard other than sheer speculation, we are unable to conclude that one whose burden, by the nature of his claim, is to show continuing and total disability for nearly twenty years supplies the essential proof of continuity when he wholly omits to show his whereabouts, activities or condition for five years, although the record discloses evidence must have been available, and, further, throws no light upon three additional years, except for one vaguely described and dated visit to his former home. Nothing in the Seventh Amendment requires it should be allowed to join forces with the jury system to bring about such a result. That guaranty requires that the jury be allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them. It permits expert opinion to have the force of fact when based on facts which sustain it. But it does not require that experts or the jury be permitted to make inferences from the withholding of crucial facts, favorable in their effects to the party who has the evidence of them in his peculiar knowledge and possession, but elects to keep it so. The words "total and permanent" are the statute's, not our own. They mean something more than incipient or occasional disability. We hardly need add that we give full credence to all of the testimony. But that cannot cure its inherent vagueness or supply essential elements omitted or withheld.

Accordingly, the judgment is

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur, dissenting:

The Seventh Amendment to the Constitution provides:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall

be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

The Court here re-examines testimony offered in a common law suit, weighs conflicting evidence, and holds that the litigant may never take this case to a jury. The founders of our government thought that trial of fact by juries rather than by judges was an essential bulwark of civil liberty.[1] For this reason, among others, they adopted Article III, § 2 of the Constitution, and the Sixth and Seventh Amendments. Today's decision marks a continuation of the gradual process of judicial erosion which in one-hundred-fifty years has slowly worn away a major portion of the essential guarantee of the Seventh Amendment.

## I.

Alexander Hamilton in The Federalist emphasized his loyalty to the jury system in civil cases and declared that jury verdicts should be re-examined, if at all, only "by a second jury, either by remanding the cause to the court below for a second trial of the fact, or by directing an issue immediately out of the Supreme Court." He divided the citizens of his time between those who thought that

[1] "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." 3 Writings of Thomas Jefferson (Washington ed.) 71.

The operation of the jury trial system in civil cases has been subject to careful analysis; Clark and Shulman, Jury Trial in Civil Cases, 43 Yale L. Jour. 867; Harris, Is the Jury Vanishing, 7 N. Y. U. L. Q. 657. Its utility has been sharply criticized; Pound, Jury—England and United States, 8 Encyclopedia of the Social Sciences 492; Mr. Justice Miller, The System of Trial by Jury, 21 American L. Rev. 859 (1887). On the other hand, this Court has on occasion warmly praised this mode of trial: "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." *Jacob v. New York,* 315 U. S. 752.

jury trial was a "valuable safeguard to liberty" and those who thought it was "the very palladium of free government." However, he felt it unnecessary to include in the Constitution a specific provision placing jury trial in civil cases in the same high position as jury trial in criminal cases.[2]

Hamilton's view, that constitutional protection of jury trial in civil cases was undesirable, did not prevail. On the contrary, in response to widespread demands from the various State Constitutional Conventions, the first Congress adopted the Bill of Rights containing the Sixth and Seventh Amendments, intended to save trial in both criminal and common law cases from legislative or judicial abridgment.[3] The first Congress expected the Seventh Amendment to meet the objections of men like Patrick Henry to the Constitution itself. Henry, speaking in the Virginia Constitutional Convention, had expressed the general conviction of the people of the Thirteen States when he said, "Trial by jury is the best appendage of freedom. . . . We are told that we are to part with that trial by jury with which our ancestors secured their lives and property. . . . I hope we shall never be induced, by such arguments, to part with that excellent mode of trial. No appeal can now be made as to fact in common law suits. *The unanimous verdict of impartial men cannot be reversed.*"[4] The first Congress, therefore,

---

[2] For Hamilton's views on the place of the jury in the Constitution, see The Federalist, Nos. 81 and 83.

[3] "One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases." *Parsons* v. *Bedford,* 3 Pet. 433, 446. Of the seven States which, in ratifying the Constitution, proposed amendments, six included proposals for the preservation of jury trial in civil cases. Documents Illustrative of the Formation of the Constitution, House Doc. No. 398, 69th Cong., 1st Sess., pp. 1019 (Massachusetts), 1026 (New Hampshire), 1029 (Virginia), 1036 (New York), 1046 (North Carolina), 1054 (Rhode Island).

[4] 3 Elliott's Debates, 324, 544. Emphasis added.

provided for trial of common law cases by a jury, even when such trials were in the Supreme Court itself. 1 Stat. 73, 81.

In 1789, juries occupied the principal place in the administration of justice. They were frequently in both criminal [5] and civil cases the arbiters not only of fact but of law. Less than three years after the ratification of the Seventh Amendment, this Court called a jury in a civil case brought under our original jurisdiction. There was no disagreement as to the facts of the case. Chief Justice Jay, charging the jury for a unanimous Court, three of whose members had sat in the Constitutional Convention, said: "For as, on the one hand, it is presumed that juries are the best judges of facts; it is, on the other hand, presumable that the court are the best judges of law. But still, both objects are lawfully within your power of decision." *Georgia* v. *Brailsford,* 3 Dall. 1, 4. Similar views were held by state courts in Connecticut, Massachusetts, Illinois, Louisiana and presumably elsewhere.[6]

The principal method by which judges prevented cases from going to the jury in the Seventeenth and Eighteenth Centuries was by the demurrer to the evidence, under

[5] The early practice under which juries were empowered to determine issues of law in criminal cases was not formally rejected by this Court until 1894 in *Sparf* v. *United States,* 156 U. S. 51, when the subject was exhaustively discussed. See also Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582. This jury privilege was once considered of high value; in fact, a principal count in the impeachment proceedings against Justice Chase in 1805 was that he had denied to a jury the right to determine both the law and the fact in a criminal case—a charge which Justice Chase denied. Report of Trial of Hon. Samuel Chase (1805), appendix p. 17. This privilege is still at least nominally retained for the jury in some states. Howe, 614. For a late 19th Century statement of this view see *Kane* v. *Commonwealth,* 89 Pa. St. 522 (1879).

[6] See Howe, *supra,* pp. 597, 601, 605, 610; *Coffin* v. *Coffin,* 4 Mass. 1, 25; Thayer on Evidence (1898 ed.) 254. And see Lectures given by Justice Wilson as Professor of Law at the College of Philadelphia in 1790 and 1792, Thayer, 254, and *Sparf* v. *United States, supra,* at 158.

which the defendant at the end of the trial admitted all facts shown by the plaintiff as well as all inferences which might be drawn from the facts, and asked for a ruling of the Court on the "law of the case." [7] See for example *Wright* v. *Pindar,* (1647) Aleyn 18 and *Pawling* v. *United States,* 4 Cranch 219. This practice fell into disuse in England in 1793, *Gibson* v. *Hunter,* 2 H. Bl. 187, and in the United States federal courts in 1826, *Fowle* v. *Alexandria,* 11 Wheat. 320. The power of federal judges to comment to the jury on the evidence gave them additional influence. *M'Lanahan* v. *Universal Insurance Co.,* 1 Pet. 170 (1828). The right of involuntary non-suit of a plaintiff, which might have been used to expand judicial power at jury expense was at first denied federal courts. *Elmore* v. *Grymes,* 1 Pet. 469; *DeWolf* v. *Rabaud,* 1 Pet. 476; but cf. *Coughran* v. *Bigelow,* 164 U. S. 301 (1896).

As Hamilton had declared in The Federalist, the basic judicial control of the jury function was in the court's power to order a new trial.[8] In 1830, this Court said: "The only modes known to the common law to re-examine such facts, are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a *venire facias de novo,* by an appellate court, for some error of law which intervened in the proceedings." *Parsons* v. *Bedford, supra, at* 448.[9] That retrial by a new jury rather than fac-

---

[7] I assume for the purpose of this discussion without deciding the point that the adoption of the Seventh Amendment was meant to have no limiting effect on the contemporary demurrer to evidence practice.

[8] A method used in early England of reversal of a jury verdict by the process of attaint which required a review of the facts by a new jury of twenty-four and resulted in punishment of the first jury for its error, had disappeared. Plucknett, A Concise History of the Common Law (2d ed.), 121.

[9] It is difficult to describe by any general proposition the circumstances under which a new trial would be allowed under early practice, since each case was so dependent on its peculiar facts. The early Pennsylvania rule was put as follows: "New trials are frequently neces-

tual reëvaluation by a court is a constitutional right of genuine value was restated as recently as *Slocum* v. *New York Life Insurance Co.*, 228 U. S. 364.[10]

A long step toward the determination of fact by judges instead of by juries was the invention of the directed verdict.[11] In 1850, what seems to have been the first directed

---

sary, for the purpose of attaining complete justice; but the important right of trial by jury requires they should never be granted without solid and substantial reasons; otherwise the province of jurymen might be often transferred to the judges, and *they* instead of the jury, would become the real triers of the facts. A reasonable doubt, barely, that justice has not been done, especially in cases where the value or importance of the cause is not great, appears to me to be too slender a ground for them. But, whenever it appears with a reasonable certainty, that actual and manifest injustice is done, or that the jury have proceeded on an evident mistake, either in point of law, or fact, or contrary to strong evidence, or have grossly misbehaved themselves, or given extravagant damages; the Court will always give an opportunity, by a new trial, of rectifying the mistakes of the former jury, and of doing complete justice to the parties." *Cowperthwaite* v. *Jones*, 2 Dall. 55 (Phila. Ct. Cmn. Pleas 1790). For expressions in substantial accord, see *Maryland Insurance Co.* v. *Ruden's Administrator*, 6 Cranch 338, 340; *M'Lanahan* v. *Universal Insurance Co.*, 1 Pet. 170, 183. For similar State practice, see *Utica Insurance Co.* v. *Badger*, 3 Wend. 102 (1829); *New York Firemen Insurance Co.* v. *Walden*, 12 Johns. 513 (1815). The motion for new trial was addressed to the discretion of the trial judge and was not reviewable in criminal or civil cases. *United States* v. *Daniel*, 6 Wheat. 542, 548; *Brown* v. *Clarke*, 4 How. 4, 15. The number of new trials permitted in a given case were usually limited to two or three; see e. g. *Louisville & Nashville R. Co.* v. *Woodson*, 134 U. S. 614. The power of the judge was thus limited to his authority to return the case to a new jury for a new decision.

[10] Cf. *Baltimore & Carolina Line* v. *Redman*, 295 U. S. 654; *Aetna Insurance Co.* v. *Kennedy*, 301 U. S. 389. See Rule 50 (b) of the Rules of Civil Procedure; *Montgomery Ward & Co.* v. *Duncan*, 311 U. S. 243; *Berry* v. *United States*, 312 U. S. 450. .

[11] I do not mean to minimize other forms of judicial control. In a summary of important techniques of judicial domination of the jury, Thayer lists the following: control by the requirement of a "reasonable judgment"—i. e., one satisfactory to the judge; control of the rules

verdict case considered by this Court, *Parks* v. *Ross*, 11 How. 362, was presented for decision. The Court held that the directed verdict serves the same purpose as the demurrer to the evidence, and that since there was "no evidence whatever"[12] on the critical issue in the case, the directed verdict was approved.[13] The decision was an innovation, a departure from the traditional rule restated only fifteen years before in *Greenleaf* v. *Birth*, 9 Pet. 292, 299 (1835), in which this Court had said: "Where there is no evidence tending to prove a particular fact, the court are bound so to instruct the jury, when requested; but they cannot legally give any instruction which shall take from the jury the right of weighing the evidence and determining what effect it shall have."

This new device contained potentialities for judicial control of the jury which had not existed in the demurrer to the evidence. In the first place, demurring to the evi-

of "presumption," cf. the dissenting opinion in *New York Life Insurance Co.* v. *Gamer*, 303 U. S. 161, 172; the control of the "definition of language"; the control of rules of practice, and forms of pleading ("It is remarkable how judges and legislatures in this country are unconsciously travelling back towards the old result of controlling the jury, by requiring special verdicts and answers to specific questions. Logic and neatness of legal theory have always called loud, at least in recent centuries, for special verdicts. . . . Considerations of policy have called louder for leaving to the jury a freer hand." 218); the control of "mixed questions of law and fact"; the control of factual decisions by appellate courts. Thayer on Evidence (1898 ed.) p. 208 *et seq.*

[12] Counsel seeking the directed verdict said: "This prerogative of the court is never exercised, but in cases where the evidence is so indefinite and unsatisfactory, that nothing but wild, irrational conjecture, or licentious speculation, could induce the jury to pronounce the verdict which is sought at their hands." *Parks* v. *Ross, supra,* at 372.

[13] See also, *Pleasants* v. *Fant,* 22 Wall. 116 (1874); *Oscanyan* v. *Arms Co.,* 103 U. S. 261 (1880); and *Baylis* v. *Travellers' Insurance Co.,* 113 U. S. 316 (1884). For an excellent discussion of the history of the directed verdict, see Hackett, Has a Trial Judge of a United States Court the Right to Direct a Verdict?, 24 Yale L. Jour. 127.

dence was risky business, for in so doing the party not only admitted the truth of all the testimony against him but also all reasonable inferences which might be drawn from it; and upon joinder in demurrer the case was withdrawn from the jury while the court proceeded to give final judgment either for or against the demurrant. *Hopkins* v. *Railroad*, 96 Tenn. 409, 34 S. W. 1029; *Suydam* v. *Williamson*, 20 How. 427, 436; *Bass* v. *Rublee*, 76 Vt. 395, 400, 57 A. 965. Imposition of this risk was no mere technicality; for by making withdrawal of a case from the jury dangerous to the moving litigant's cause, the early law went far to assure that facts would never be examined except by a jury. Under the directed verdict practice, the moving party takes no such chance, for if his motion is denied, instead of suffering a directed verdict against him, his case merely continues into the hands of the jury. The litigant not only takes no risk by a motion for a directed verdict, but in making such a motion gives himself two opportunities to avoid the jury's decision; for under the federal variant of judgment notwithstanding the verdict, the judge may reserve opinion on the motion for a directed verdict and then give judgment for the moving party after the jury has formally found against him.[14] In the second place, under the directed verdict practice the courts soon abandoned the "admission of all facts and reasonable inferences" standard referred to, and created the so-called "substantial evidence" rule which permitted directed verdicts even though there was far more evidence in the case than a plaintiff would have needed to withstand a demurrer.

The substantial evidence rule did not spring into existence immediately upon the adoption of the directed verdict device. For a few more years [15] federal judges

---

[14] Rule 50 (b) of the Rules of Civil Procedure and note 10, *supra*.

[15] In the period of the Civil War, the formula changed slightly but its effect was the same—if the evidence so much as "tended to prove

held to the traditional rule that juries might pass finally on facts if there was "any evidence" to support a party's contention. The rule that a case must go to the jury unless there was "no evidence" was completely repudiated in *Improvement Co.* v. *Munson*, 14 Wall. 442, 447 (1871), upon which the Court today relies in part. There the Court declared that "some" evidence was not enough—there must be evidence sufficiently persuasive to the judge so that he thinks "a jury can properly proceed." The traditional rule was given an ugly name, "the scintilla rule," to hasten its demise. For a time, traces of the old formula remained, as in *Randall* v. *B. & O. R. Co.*, 109 U. S. 478, but the new spirit prevailed. See for example *Pleasants* v. *Fant, supra,* and *Commissioners* v. *Clark,* 94 U. S. 278. The same transition from jury supremacy to jury subordination through judicial decisions took place in state courts.[16]

Later cases permitted the development of added judicial control.[17] New and totally unwarranted formulas, which should surely be eradicated from the law at the first opportunity, were added as recently as 1929 in *Gunning* v. *Cooley,* 281 U. S. 90, which, by sheerest dictum, made new encroachments on the jury's constitutional functions. There it was announced that a judge might weigh the evidence to determine whether he, and not the jury,

the position" of the party, the case was for the jury. *Drakely* v. *Gregg,* 8 Wall. 242, 268; *Hickman* v. *Jones,* 9 Wall. 197, 201; *Barney* v. *Schmeider,* 9 Wall. 248, 253. Cf. *United States* v. *Breitling,* 20 How. 252; *Goodman* v. *Simonds,* 20 How. 343, 359.

[16] For examples of early respect for juries, see *Morton* v. *Fairbanks,* 11 Pick. 368 (1831); *Way* v. *Illinois Central R. Co.,* 35 Iowa 585 (1873). For the development in Illinois, see 8 Ill. L. Rev. 287, 481–486. For the Pennsylvania development, compare *Fitzwater* v. *Stout,* 16 Pa. St. 22, and *Thomas* v. *Thomas,* 21 Pa. St. 315, with *Hyatt* v. *Johnston,* 91 Pa. St. 196, 200.

[17] One additional device was the remittitur practice which gives the court a method of controlling jury findings as to damages. *Arkansas Valley Co.* v. *Mann,* 130 U. S. 69.

thought it was "overwhelming" for either party, and then direct a verdict. Cf. *Pence* v. *United States,* 316 U. S. 332, 340. *Gunning* v. *Cooley,* at 94, also suggests, quite unnecessarily for its decision, that "When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither." This dictum, which assumes that a judge can weigh conflicting evidence with mathematical precision and which wholly deprives the jury of the right to resolve that conflict, was applied in *Pennsylvania R. Co.* v. *Chamberlain,* 288 U. S. 333. With it, and other tools, jury verdicts on disputed facts have been set aside or directed verdicts authorized so regularly as to make the practice commonplace, while the motion for directed verdict itself has become routine. See for example *Southern Railway Co.* v. *Walters,* 284 U. S. 190; *Atlantic Coast Line* v. *Temple,* 285 U. S. 143; *Lumbra* v. *United States,* 290 U. S. 551; *Pence* v. *United States, supra;* and *De Zon* v. *United States,* 318 U. S. 660.

Even *Gunning* v. *Cooley,* at 94, acknowledged that "issues that depend on the credibility of witnesses . . . are to be decided by the jury." [18] Today the Court comes dangerously close to weighing the credibility of a witness and rejecting his testimony because the majority do not believe it.

The story thus briefly told depicts the constriction of a constitutional civil right and should not be continued.

---

[18] In *Ewing* v. *Burnet,* 11 Pet. 41, 51, this Court said: "It was also their [the jury's] province to judge of the credibility of the witnesses, and the weight of their testimony, as tending, in a greater or less degree, to prove the facts relied on; as these were matters with which the court could not interfere, the plaintiff's right to the instruction asked, must depend upon the opinion of the court, on a finding by the jury in favour of the defendant, on every matter which the evidence conduced to prove; giving full credence to the witnesses produced by him, and discrediting the witness for the plaintiff."

Speaking of an aspect of this problem, a contemporary writer saw the heart of the issue: "Such a reversal of opinion [as that of a particular state court concerning the jury function], if it were isolated, might have little significance, but when many other courts throughout the country are found to be making the same shift and to be doing so despite the provisions of statutes and constitutions there is revealed one aspect of that basic conflict in the legal history of America—the conflict between the people's aspiration for democratic government,[19] and the judiciary's desire for the orderly supervision of public affairs by judges." [20]

The language of the Seventh Amendment cannot easily be improved by formulas.[21] The statement of a district judge in *Tarter* v. *United States,* 17 F. Supp. 691, 692–693, represents, in my opinion, the minimum meaning of the Seventh Amendment:

"The Seventh Amendment to the Constitution guarantees a jury trial in law cases, where there is substantial

---

[19] Another phase of this same conflict arises in the use of judicial power to punish for contempt of court without allowance of jury trial. Nelles and King, Contempt by Publication, 28 Col. L. Rev. 400, 524, and, for a sharp indictment of the free use of contempt jurisdiction as basically undemocratic, 553; *Nye* v. *United States,* 313 U. S. 33; *Bridges* v. *California,* 314 U. S. 252.

[20] Howe, *supra,* 615, 616. Howe continues: "What seems discreditable to the judiciary in the story which I have related is the fierce resolution and deceptive ingenuity with which the courts have refused to carry out the unqualified mandate of statutes and constitutions. It is possible to feel that the final solution of the problem has been wise without approving the frequently arrogant methods which courts have used in reaching that result."

[21] This Court has said of one type of case in *Richmond & Danville R. Co.* v. *Powers,* 149 U. S. 43, 45 (1893): "It is well settled that where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this, whether the uncertainty arises from a conflict in the testimony, or because the facts being undisputed, fair minded men will honestly draw different conclusions from them."

evidence to support the claim of the plaintiff in an action. If a single witness testifies to a fact sustaining the issue between the parties, or if reasoning minds might reach different conclusions from the testimony of a single witness, one of which would substantially support the issue of the contending party, the issue must be left to the jury. Trial by jury is a fundamental guaranty of the rights of the people, and judges should not search the evidence with meticulous care to deprive litigants of jury trials."

The call for the true application of the Seventh Amendment is not to words, but to the spirit of honest desire to see that constitutional right preserved. Either the judge or the jury must decide facts and, to the extent that we take this responsibility, we lessen the jury function. Our duty to preserve this one of the Bill of Rights may be peculiarly difficult, for here it is our own power which we must restrain. We should not fail to meet the expectation of James Madison, who, in advocating the adoption of the Bill of Rights, said: "Independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; . . . they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of right." So few of these cases come to this Court that, as a matter of fact, the judges of the District Courts and the Circuit Courts of Appeals are the primary custodians of the Amendment. As for myself, I believe that a verdict should be directed, if at all, only when, without weighing the credibility of the witnesses, there is in the evidence no room whatever for honest difference of opinion over the factual issue in controversy. I shall continue to believe that in all other cases a judge should, in obedience to the command of the Seventh Amendment, not interfere with the jury's function. Since this is a matter of high constitutional importance, appellate courts should be alert to insure the preservation of this constitutional right even though each case necessarily turns on its peculiar circumstances.

408

## II.

The factual issue for determination here is whether the petitioner incurred a total and permanent disability not later than May 31, 1919. It is undisputed that the petitioner's health was sound in 1918, and it is evidently conceded that he was disabled at least since 1930. When, in the intervening period, did the disability take place?

A doctor who testified diagnosed the petitioner's case as a schizophrenic form of dementia praecox. He declared it to be sound medical theory that while a normal man can retain his sanity in the face of severe mental or physical shock, some persons are born with an inherent instability so that they are mentally unable to stand sudden and severe strain. The medical testimony was that this petitioner belongs to the latter class and that the shock of actual conflict on the battle front brought on the incurable affliction from which he now suffers. The medical witness testified that the dominant symptoms of the condition are extreme introversion and preoccupation with personal interests, a persecution complex, and an emotional instability which may be manifested by extreme exhilaration alternating with unusual depression or irrational outbursts. Persons suffering from this disease are therefore unable to engage in continuous employment.

The petitioner relies on the testimony of wartime and postwar companions and superiors to show that his present mental condition existed on the crucial date. There is substantial testimony from which reasonable men might conclude that the petitioner was insane from the date claimed.

Two witnesses testify as to the petitioner's mental irresponsibility while he was in France. The most striking incident in this testimony is the account of his complete breakdown while on guard duty as a result of which he falsely alarmed his military unit by screaming that the

Germans were coming when they were not and was silenced only by being forceably bound and gagged. There was also other evidence that Galloway became nervous, irritable, quarrelsome and turbulent after he got to France. The Court disposes of this testimony, which obviously indicates some degree of mental unbalance, by saying no more than that it "does not prove he was insane." No reason is given, nor can I imagine any, why a jury should not be entitled to consider this evidence and draw its own conclusions.

The testimony of another witness, O'Neill, was offered to show that the witness had known the petitioner both before and after the war, and that after the war the witness found the petitioner a changed man; that the petitioner imagined that he was being persecuted; and that the petitioner suffered from fits of melancholia, depression and weeping. If O'Neill's testimony is to be believed, the petitioner suffered the typical symptoms of a schizophreniac for some years after his return to this country; therefore if O'Neill's testimony is believed, there can be no reasonable doubt about the right of a jury to pass on this case. The Court analyzes O'Neill's testimony for internal consistency, criticizes his failure to remember the details of his association with the petitioner fifteen years before his appearance in this case, and concludes that O'Neill's evidence shows no more than that "petitioner was subject to alternating periods of gaiety and depression for some indefinite period." This extreme emotional instability is an accepted symptom of the disease from which the petitioner suffers. If he exhibited the same symptoms in 1922, it is, at the minimum, probable that the condition has been continuous since an origin during the war. O'Neill's testimony coupled with the petitioner's present condition presents precisely the type of question which a jury should resolve.

The petitioner was in the Navy for six months in 1920, until he was discharged for bad conduct; and later was in the Army during 1921 and a part of 1922, until he deserted. The testimony of his Commanding Officer while he was in the Army, Col. Matthews, is that the petitioner had "periods of gaiety and exhilaration" and was then "depressed as if he had had a hangover"; that petitioner tried to create disturbances and dissatisfy the men; that he suffered from a belief that he was being treated unfairly; and that generally his actions "were not those of a normal man." The Colonel was not a doctor and might well not have recognized insanity had he seen it; as it was, he concluded that the petitioner was an alcoholic and a narcotic addict. However, the officer was unable, upon repeated investigations, to discover any actual use of narcotics. A jury fitting this information into the general pattern of the testimony might well have been driven to the conclusion that the petitioner was insane at the time the Colonel had him under observation.

All of this evidence, if believed, showed a man, healthy and normal before he went to the war, suffering for several years after he came back from a disease which had the symptoms attributed to schizophrenia and who was insane from 1930 until his trial. Under these circumstances, I think that the physician's testimony of total and permanent disability by reason of continuous insanity from 1918 to 1938 was reasonable. The fact that there was no direct testimony for a period of five years, while it might be the basis of fair argument to the jury by the Government, does not, as the Court seems to believe, create a presumption against the petitioner so strong that his case must be excluded from the jury entirely. Even if during these five years the petitioner was spasmodically employed, we could not conclude that he was not totally and permanently disabled. *Berry* v. *United States,* 312 U. S. 450, 455. It is not doubted that

schizophrenia is permanent even though there may be a momentary appearance of recovery.

The court below concluded that the petitioner's admission into the military service between 1920 and 1923 showed conclusively that he was not totally and permanently disabled. Any inference which may be created by the petitioner's admission into the Army and the Navy is more than met by his record of court-martial, dishonorable discharge, and desertion, as well as by the explicit testimony of his Commanding Officer, Colonel Matthews.

This case graphically illustrates the injustice resulting from permitting judges to direct verdicts instead of requiring them to await a jury decision and then, if necessary, allow a new trial. The chief reason given for approving a directed verdict against this petitioner is that no evidence except expert medical testimony was offered for a five to eight year period. Perhaps, now that the petitioner knows he has insufficient evidence to satisfy a judge even though he may have enough to satisfy a jury, he would be able to fill this time gap to meet any judge's demand. If a court would point out on a motion for new trial that the evidence as to this particular period was too weak, the petitioner would be given an opportunity to buttress the physician's evidence. If, as the Court believes, insufficient evidence has been offered to sustain a jury verdict for the petitioner, we should at least authorize a new trial. Cf. *Garrison* v. *United States*, 62 F. 2d 41, 42.

I believe that there is a reasonable difference of opinion as to whether the petitioner was totally and permanently disabled by reason of insanity on May 31, 1919, and that his case therefore should have been allowed to go to the jury. The testimony of fellow soldiers, friends, supervisors, and of a medical expert whose integrity and ability is not challenged cannot be rejected by any process available to me as a judge.