No. 83-433

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

FARMERS UNION GRAIN TERMINAL
ASSOCIATION, a corporation,

Plaintiff and Appellant,

-vs-

MONTANA POWER COMPANY, a
corporation,

Defendant and Respondent.

---

APPEAL FROM: District Court of the Tenth Judicial District,
In and for the County of Judith Basin,
The Honorable LeRoy McKinnon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Marra, Wenz, Johnson & Hopkins; ~~Neil~~ Jensen,
Great Falls, Montana          *Neal*

For Respondent:

Jardine, Stephenson, Blewett & Weaver; Keith
Tokerud, Great Falls, Montana

---

Submitted on Briefs: Jan. 31, 1985

Decided: JUN 7 1985

Filed: JUN 7 1985

*Ethel M. Harrison*

---

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Farmers Union Grain Terminal Association (GTA) appeals a judgment following jury verdict for Montana Power Co. (Montana Power) in the District Court of the Tenth Judicial District, Judith Basin County. We affirm.

The issues presented on appeal are:

1. Was the evidence sufficient to require a reversal of the jury finding that Montana Power's negligence was not a proximate cause of the fire that destroyed the GTA elevator?

2. Did the trial court commit reversible error by hampering the GTA expert's testimony as to the cause of the fire?

3. Did the trial court err in giving two jury instructions to which GTA objected?

The GTA grain elevator was located at Coffee Creek, Montana, about 15 miles from Stanford and 7 miles from Denton. The elevator was cribbed construction, which means that the wooden 2 x 6's and 2 x 4's were laid on the flat side, one on top of the other and nailed together. This is a common form of grain elevator construction.

Electrical service to the elevator was furnished by Montana Power through a single-phase transformer, which furnished 110-220 volt power, and through a three-phase transformer, which furnished 208 volt power for larger motors. The electric service lines entered through the roof of the scale room and ran through a meter base into which the Montana Power meter was plugged and then into the main breaker box. The meter and breaker box were located on the west wall of the scale room and there were various other electrical boxes located along that west wall.

The Montana Power evidence established that the Montana Power wires attached to the GTA wires on the outside of the

2

elevator, so that the wire and conduit which ran down the west wall of the room to the meter base belonged to GTA. Although the meter belonged to Montana Power, the meter base belonged to GTA. The evidence also established that the conduit, wire, various breaker boxes and electrical equipment located in the scale room belonged to GTA with the single exception of the electric meter.

On the weekend prior to Monday, July 30, 1979, a lightening storm occurred in the Coffee Creek area. Without positive proof, various witnesses assumed lightening had struck the GTA elevator or in its vicinity, causing significant damage to the electric meter located in the scale room. Evidence established that there had been a fire in the scale room that had resulted in some burning along the walls. In addition, a cardboard box of light bulbs on the floor had burned.

On Monday, July 30, Mr. Pemberton, a lineman for Montana Power, came to the elevator to read the meter. He had worked as a lineman in this area for many years. The elevator was not operating at that time, as the prior tenant had terminated its lease and GTA had not yet begun operating the elevator. During this period, the elevator was essentially empty of grain. Mr. Pemberton looked at the meter and saw that it had been damaged, was unreadable and had to be replaced. He also noticed there had been a fire in the cardboard box. Mr. Pemberton testified he saw no damage to any of the electrical equipment except the meter, although he did not check the rest of the equipment, which was owned by GTA.

Later that day Mr. Pemberton received a report that the bulk plant near the elevator had no electric power. He determined that the smaller transformer which served both the elevator and the bulk plant had tripped out. He reset the

3

transformer on Monday and ordered a replacement meter, which was never installed. From Monday to Friday of that week, a number of the prior tenant's and GTA's employees were in the elevator.

On Friday, August 3, 1979, after receiving a report that the larger transformer had a red light showing on it, Mr. Pemberton reset the larger transformer, which furnished three-phase power. Within a relatively short time after the resetting of that transformer, the elevator was reported to be on fire. Essentially all of the elevator, including the scale room and all the electrical equipment in it were destroyed. The testimony of various witnesses as to their observations before the fire and the interpretation of that evidence by the experts of both sides constituted the evidence as to the cause of the fire.

Following a jury trial, a special verdict was returned indicating that the jury found that the Montana Power Company was negligent, but that the negligence of Montana Power was not a proximate cause of the damage to GTA's elevator. As a result, judgment was entered for Montana Power. GTA appeals.

I

Was the evidence sufficient to require a reversal of the jury finding that Montana Power's negligence was not a proximate cause of the fire that destroyed the GTA elevator?

GTA argues that overwhelming evidence established that the fire was caused by the restoration of electricity by the Montana Power lineman. GTA bases its primary argument upon the expert testimony of Dr. Bernstein, a professor of electrical engineering from the University of Wisconsin. Dr. Bernstein's credentials were extensive with regard to his experience in the theory of electricity, his work in revising electrical codes, investigating approximately 100 fires

4

relating to electrical causes, and testifying in approximately 20 trials on behalf of both plaintiffs and defendants. In addition, he is the author of various publications about lightening caused fires and other causes of electrical fires. In substance, Dr. Bernstein concluded that the conduct of the Montana Power lineman was the cause of the fire. He also indicated another possibility which will be discussed later.

Montana Power relied on the testimony of Mr. Pemberton, the Montana Power lineman who had approximately 20 years of experience as a lineman, including 17 years of experience servicing the GTA elevator. Montana Power also called Mr. Williams, the linemen's supervisor for Fergus Electric Co-Operative of Lewistown. Mr. Williams had approximately 28 years experience as a lineman. Mr. Ronish, a private business electrician with 30 years of experience, including 11 years as a lineman, was also called.

The testimony of these three witnesses directly contradicted parts of Dr. Bernstein's testimony. As a result, the jury was required to evaluate the testimony of the various experts and determine which portions of the testimony it found more believable.

While GTA argues that its evidence was overwhelming in nature, that is not the standard of review to be applied. As we pointed out in Gunnels v. Hoyt (Mont. 1981), 633 P.2d 1187, 1191, 38 St.Rep. 1492, 1495:

> "We review the evidence in a light most favorable to the prevailing party. We will reverse only where there is a lack of substantial evidence to support the judgment.
>
> "Evidence may be inherently weak and still be deemed substantial, and substantial evidence may conflict with other evidence." (citations omitted)

In Jacques v. Montana Nat. Guard (Mont. 1982), 649 P.2d 1319, 1325, 39 St.Rep. 1565, 1573-74, citing Galloway v. United

States (1943), 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (Black J., dissenting), this Court agreed with Justice Black's warning of the possible constitutional infringements inherent in setting aside a jury verdict:

> "'. . . I believe that a verdict should be directed, if at all, only when, without weighing the credibility of the witnesses, there is in the evidence no room whatever for honest difference of opinion over the factual issue in controversy. I shall continue to believe that in all other cases a judge should, in obedience to the command of the Seventh Amendment, not interfere with the jury's function. Since this is a matter of high constitutional importance, appellate courts should be alert to insure the preservation of this constitutional right even though each case necessarily turns on its peculiar circumstances.' 319 U.S. at 407, 63 S.Ct. at 1096, 87 L.Ed. at 1480."

Our appellate review is limited to an analysis of the evidence to determine whether there is substantial evidence to support the jury verdict. We may reverse the jury verdict only if the evidence is so overwhelming that there is no room for an honest difference of opinion on the issue of causation.

The GTA briefs carefully review the evidence submitted in behalf of GTA. We do not find it necessary to review that evidence in detail. The evidence was extensive, well prepared and certainly would have supported a verdict for GTA on the question of proximate cause, had the jury given such a verdict. However, our analysis here must be directed to the evidence submitted by Montana Power.

On Monday, July 30, Mr. Pemberton reset the smaller or lighter transformer (single-phase power) after being told that the bulk plant had no electric power. Pemberton's testimony established that he climbed the pole on which the transformer was located and hooked up his volt-ammeter to the wire running from the secondary side of the transformer to the elevator. When he looked at the ammeter to see if there

6

was any current passing, he found none and concluded that the transformer had been tripped out. Pemberton then testified that he used a stick to reset the handle on the side of the transformer. As he reset the transformer, Pemberton testified that he watched his ammeter to see what the electrical current did as the transformer was reenergized. The ammeter needle moved just a little, indicating to Pemberton that power was restored to the secondary line, but also indicating that there was no short circuit or other apparent fault. In the absence of any significant amperage reading, Pemberton concluded that there was no indication of equipment damage that required further analysis on his part.

Dr. Bernstein testified that Mr. Pemberton was negligent in turning on the electricity after viewing the damaged meter. Mr. Williams, the linemen's supervisor from the Co-op, and Mr. Ronish, the independent electrician, both testified that the procedure followed by Pemberton was correct and that a damaged meter does not necessarily indicate a problem in an electric system. All three of the Montana Power witnesses testified that if there were visible damage to other electrical equipment, then the power should not be turned on. Pemberton testified that except for the electric meter, he saw no indication of damage to other electrical equipment. All three Montana Power witnesses testified that when the reset transformer "held" and there was no flow of power to indicate a short circuit or similar condition, the lineman could safely allow the power to continue to flow. The testimony by the Montana Power witnesses also established that it was not the lineman's responsibility to inspect or repair equipment owned by the customer.

The only evidence of damage to the main breaker box owned by GTA and located next to the meter was presented in

7

the testimony of Mr. Patterson and Mr. Nemec. Patterson, an employee of the Co-op which had operated the elevator, testified that while he was in the scale room, he opened GTA's main breaker box and showed Nemec that there were charred wires on the inside. There is no testimony that this information was ever passed on to the Montana Power Company. The testimony established that a GTA employee instructed one of the Co-op employees to hire an electrician to take care of matters in the scale room, but this was not done prior to the fire. Mr. Ronish's testimony established that an independent electrician was close by and available to do the work.

The Montana Power witnesses' testimony established that, with the single exception of the electric meter, GTA was responsible for the various components of the electrical system in the scale room. This testimony established that it was GTA's responsibility to maintain and repair the conduit and wire coming into the scale room, and all of the conduit and breaker boxes below the meter, including the breaker box in which the charred wires were observed.

In addition, on Friday, August 3, a number of GTA personnel inspected the elevator in order to prepare it to receive grain. One of the GTA personnel, Mr. Fredrick, testified that he touched the main switch to see if it was burned out and to determine if it had to be replaced. He testified that when he took hold of and barely moved the door to open it, there was a flash and a loud buzzing sound or arcing sound. Mr. Fredrick testified that he had not believed there was electrical power running to the elevator. When this arcing sound and flash occurred, he realized there was electrical power running to the elevator. He testified that he did not open any of the other meter boxes or touch any of the other equipment.

8

The testimony on the part of the GTA personnel was that they agreed to contact someone in order to have the electrical system checked. There is no evidence to establish that either an electrician or Montana Power were advised of the arcing condition which the GTA personnel observed and heard prior to the fire. The three linemen testifying for Montana Power each emphasized that the arcing condition sufficiently indicated the possibility of serious electrical problems, and someone should have been notified immediately.

Mr. Pemberton also testified that after receiving a telephone call that a red light was lit on the larger transformer, he went to the elevator on Friday. No GTA personnel were there when he arrived. His testimony established that the red warning light on the transformer goes on under two different circumstances. First, there may be an overload which is not sufficient to actually trip the circuit breaker and stop the flow of electricity, but sufficient to cause the warning light to go on. Second, the light will go on when an overload is sufficient to trip the circuit breaker and stop the flow of electricity. That Friday, Pemberton climbed the pole on which the larger transformer was located and followed a procedure similar to that which he had used with the smaller transformer on Monday. He hooked his ammeter to the line coming off the secondary side of the transformer. The ammeter showed a small load on the transformer. He then reset the transformer sufficiently so that the light went off and observed the same small load shown on the secondary side of the transformer. He testified that this indicated to him that the transformer had been on before as well as after the resetting. He further testified there was no flow of electricity on the secondary side after the resetting. This

9

indicated to him that there was no short circuit or other electrical problem at that time.

The foregoing analysis was directly contradicted by Dr. Bernstein. However, Mr. Williams and Mr. Ronish both testified that the procedure that Pemberton used was correct and safe. Both also testified that Pemberton was warranted in leaving the scene upon resetting the transformer after finding no indication of a short circuit or other electrical problem when his ammeter registered no significant reading. After resetting the larger transformer, Pemberton went to the elevator to install the new meter. However, the door was locked and he was not able to get in.

Dr. Bernstein emphasized in his testimony that it was improper to have restored power to the system when there was a damaged meter and that that readily could have been the cause of the fire. In contradiction to that testimony, all three of the linemen testified that none of them had ever heard of a meter causing a fire. Each testified that it was unlikely that the meter had anything to do with the fire.

In his opinion testimony, Dr. Bernstein concluded that the resetting of the transformer was the cause of the fire. However, he also gave an alternate opinion which involved GTA personnel. Dr. Bernstein stated:

> "I believe the fire started in the grain elevator on Friday, because Mr. Pemberton reset the teaser transformer [the larger transformer] and put 208 volts on to the grain elevator. The fire started shortly after he did that. I believe that is what started the fire. My other opinion is: in the event that the teaser transformer actually was on at the time Mr. Pemberton reset it, and I do not believe it was on when he reset it, because his method of measurement was not proper, I don't think he could tell. Then in that event that it had been on all the time, then I believe the fire was started by some change in the system, when the people from GTA were on [sic] the grain elevator, and they moved something which caused an arc which eventually led to a fire, and the fire was caused because power had been left on this building with damaged equipment."

10

With regard to Dr. Bernstein's conclusion that the resetting of the transformer started the fire, Mr. Pemberton testified there was no existing fault or short circuit on the secondary line at the time he reset the larger transformer. His testimony on that point was supported by the other two linemen. There is no dispute in the evidence that Pemberton checked the secondary line with the ammeter and that no fault was indicated.

In addition, Pemberton testified that he ran experiments on the same larger transformer after the fire took place and concluded that the ammeter readings before and after resetting were correct. He ran a further experiment on a similar transformer and reached the same conclusion.

There was a direct contradiction between the testimony of Dr. Bernstein and Mr. Pemberton, Williams and Ronish. The evidence submitted on each side was extensive and sufficient in nature to allow the jury to decide for either theory of causation.

Dr. Bernstein's second theory as to the cause of the fire indicated the possibility that the people from GTA moved something which caused an arc, which eventually led to the fire. Even under that theory, he concluded that fault lay with Montana Power, which had left the power on in the elevator. Even if the jury had accepted that theory, it does not require a conclusion that Montana Power's negligence was the cause of the fire. The jury could have concluded that it was the GTA employees who caused the problem by moving their own equipment, causing an arc, and negligently failing to do anything about the arc at that time. As a result, the jury could have concluded that the fire was caused by the action of GTA and resulted from GTA's failure to inform Montana Power of the arc or to take any further protective measures.

11

After a careful review of the testimony, we conclude there was substantial evidence to support the jury verdict that the negligence of Montana Power was not the proximate cause of the fire. Clearly, the evidence established a basis for an honest difference of opinion on the question of causation.

## II

Did the trial court commit reversible error by hampering the GTA expert's testimony as to the cause of the fire?

Montana Power's counsel made several objections during the course of Dr. Bernstein's testimony and the qualification by GTA counsel of Dr. Bernstein as an expert. Following one objection, counsel adjourned to the chambers where there was an extensive discussion of the rules of evidence. The court ultimately ruled that Dr. Bernstein could express his opinion and no limitations were placed on his testimony. GTA argues that the conduct of the trial court in considering these objections prejudiced GTA by hampering the expert's testimony.

We find that the action on the part of counsel was reasonable and that the action on the part of the District Court was also reasonable. We do not find anything in the record that demonstrates prejudice to GTA. We conclude there was no error on the part of the District Court in this regard.

## III

Did the trial court err in giving two jury instructions to which GTA objected?

GTA's first argument is directed to Instruction No. 40, which related to the state of mind that is required before imposition of punitive damages. In substance, Instruction No. 40 provided that one who has suffered injury through the

12

oppression, fraud or malice of another may recover exemplary damages. "Malice" was defined as importing a wish to vex, annoy or injure, or an intent to do a wrongful act. GTA argues this is confusing in light of Instruction No. 20, which provided that the negligence of GTA is not to be considered if the destruction of the elevator was proximately caused by reckless or wanton misconduct by Montana Power. "Reckless or wanton" was defined as intentional, wrongful, done either with knowledge that serious injury will probably result or with wanton and reckless disregard of possible results. GTA contends that these instructions establish different standards of conduct or intent on the part of GTA and were so confusing that the jury may have been misled.

We note that because the jury did not find that the negligence of Montana Power was a proximate cause of the fire, the jury never reached the issue of punitive damages under Instruction No. 40. In a similar manner, because the jury concluded that Montana Power's negligence was not the proximate cause, there is no basis for applying Instruction No. 20 to the facts of this case.

As we read all of the instructions together, we find no contradiction so far as Instruction No. 40 is concerned. We hold there was no prejudicial error in giving that instruction.

GTA next complains that the District Court erred in giving Instruction No. 24, which in substance provides that a person is bound to exercise reasonable care and diligence to avoid loss and may not recover for losses which could have been prevented by reasonable efforts or expenditures on his part. Again we note that the jury did not reach the issue of damages because it first concluded that Montana Power's negligence was not a proximate cause of the fire. GTA has

13

failed to show how it could have been prejudiced by this instruction.

We conclude there was no error in giving Instruction No. 24. We affirm the District Court.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

14