774 F.2d 224
 40 Fair Empl.Prac.Cas. 391, 27 Ed. Law Rep. 1073
 George D. KING, Appellant,
v.
The UNIVERSITY OF MINNESOTA, and the Board of Regents;
Verne Long, Wenda Moore, Wally Hilke, Charles Casey, William
Dosland, Erwin Goldfine, Lauris Krenik, David Lebedoff,
Charles McGuiggan, David Roe, Mary Schertler, and Willis
Drake, all in their capacity as Regents; the University of
Minnesota and C. Peter Magrath in his capacity as President
of the University of Minnesota; and Fred Lukermann,
individually, and in his capacity as Dean of the College of
Liberal Arts, Appellees.
 No. 84-5131.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 26, 1985.
Decided Sept. 25, 1985.
 
 Steve G. Heikens, Minneapolis, Minn., for appellant.
 William P. Donohue, Minneapolis, Minn., for appellees.
 Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 George D. King brought this action under 42 U.S.C. Secs. 1981 and 1983 against the University of Minnesota, and against the Board of Regents, the President, and the Dean of the College of Liberal Arts of the University of Minnesota, alleging that his termination as a tenured professor violated his constitutional rights. Following a bench trial, the District Court[1] granted judgment for defendants, 587 F.Supp. 902 (D.C.Minn.1984). King appeals, claiming that the District Court (1) erred in finding that he had received due process, (2) erred in allocating the burdens of proof with respect to his equal protection claim, (3) erred in dismissing his damage claims, and (4) erred in striking his demand for a jury trial. We affirm, holding that the District Court properly could have directed a verdict for defendants on each of King's claims. We further hold that because the District Court could have directed a verdict on each of King's claims, any error in dismissing King's damage claims, or in striking King's demand for a jury trial, was harmless.
 
 I.
 
 2
 King was hired by the University of Minnesota in 1970 as a full professor in the College of Liberal Arts, with a tenured appointment in the Department of Afro-American Studies (the Department).[2] He became the chairman of the Department in 1970 and served until 1974, when he was asked to step down as chairman by his colleagues and by the Dean.
 
 
 3
 The record reveals that from 1974 until his termination, there were complaints about King's performance by students, by colleagues, and by the successive chairmen of the Department. The complaints concerned poor teaching performance, excessive unexcused absences from class, absences from faculty meetings, low enrollment in his classes, undocumented research, and other matters.
 
 
 4
 Because of the perceived problems with his performance, King was recommended for a merit salary increase in only one year--1979. The chairman of the Department indicated that the 1979 increase was not really a merit increase, but only an acknowledgment that the problems with King had abated in that year. In other years, King was not recommended for merit increases. In 1980, for example, Geneva Southall, the chairman of the Department, gave King the following merit evaluation:
 
 
 5
 Having therefore, continued to be only a negative to the [Department], again I must recommend that Professor King be given no merit increase with the hope that the College will in its departmental response, further emphasize to Professor King its disappointment that he has failed to be the historian/teacher that his inflated salary and professorial rank warrants.
 
 
 6
 Trial Transcript at 1476.
 
 
 7
 In the 1980-81 school year, the Department was under the direction of a new chairman, Earl Scott. During the course of his first year as chairman, Scott became concerned by King's numerous unexcused absences from his classes and by his lack of participation in Department governance. Scott communicated with King and with Fred Lukermann, Dean of the College of Liberal Arts, concerning King's inadequacies as a faculty member.
 
 
 8
 Concerned that the University was not addressing the Department's problems with King, in February 1982 Scott, Southall, and two other members of the Department wrote to Dean Lukermann about the Department's personnel problems and the Dean's failure to remove uncooperative and unproductive members.
 
 
 9
 Lukermann wrote to King on February 24, 1982, admonished King about his inadequate performance in teaching, research, and service, and questioned King's competence in carrying out his duties, as well as his usefulness to the Department and to the University. On the same day, Lukermann also wrote to the chairman of the Department, with a copy to King, setting forth his dissatisfaction with King's performance and asking the Department to review these matters.
 
 
 10
 On March 12, 1982, the Department of Afro-American and African Studies met and, after a lengthy discussion with King present, voted 9-2 (with one abstention) to remove King from the Department because of his long history of disservice to the Department. Following this vote, Lukermann communicated several more times with King, but apparently was unable to satisfy himself that King was willing to improve his performance.
 
 
 11
 On February 15, 1983 Lukermann sent a letter to King initiating removal proceedings under the University of Minnesota's Regulations Concerning Faculty Tenure (Tenure Code), and giving King notice of the charges against him. In his letter Dean Lukermann referred to other communications with King that contained specific statements of dissatisfaction with King's performance as a professor.
 
 
 12
 On March 10, 1983 King requested a hearing before the Senate Judicial Committee. The Senate Judicial Committee is a group of faculty members appointed by the University of Minnesota Faculty Senate to hear faculty complaints under the Tenure Code. A panel of faculty members was appointed to hear the case in March 1983. King's counsel objected to one of the members of the panel. That member was replaced. The panel members were all tenured faculty from outside the College of Liberal Arts.
 
 
 13
 Prior to the Senate hearing, King was represented by counsel and was allowed substantial documentary discovery. King's attorney took the depositions of Lukermann, Scott, and former Dean Frank Sorauf. On May 26, 1983, a prehearing conference was held at which the parties exchanged issue lists, witness lists, and exhibit lists. On May 27, 1983, the Panel issued a prehearing conference order, which specified a number of issues pertaining to the upcoming hearing. Both sides submitted objections to the prehearing conference order. The objections were ruled on by the panel prior to the hearing.
 
 
 14
 The Senate Judicial Committee hearing was held from June 4 to June 17, 1983. King was represented by counsel. King's counsel cross-examined witnesses, presented witnesses and documentary evidence on King's behalf, and made both oral and written arguments. King did not testify at the hearing. On September 15, 1983, the panel issued its Final Findings and Recommendations, in which it recommended that King be terminated for cause under the Tenure Code.[3] As provided by the Tenure Code, the findings and recommendations were sent to the President of the University for review.
 
 
 15
 On October 27, 1983, after another round of briefing, C. Peter Magrath, President of the University, reviewed the Findings and Recommendations, and recommended to the Regents of the University of Minnesota that King be terminated.
 
 
 16
 The Regents were to consider the King matter at their December 8, 1983 meeting. Prior to the Regents' meeting, each Regent was sent the panel's findings, the President's recommendation letter, and briefs from each of the parties. The transcript of the panel hearing and the exhibits presented to the panel were available to the Regents. On December 8, 1983, the Regents heard arguments from counsel. King introduced new affidavits in support of his position and also addressed the Regents. After argument, the Regents went into closed session. The Regents adopted the findings of the Senate Judicial Committee, but did not terminate King. Instead, the Regents voted 7-2 to place King on probation for a year.
 
 
 17
 On December 14, 1984, Magrath wrote to the Regents asking them to rescind their action, claiming that the affidavits submitted by King at the Regents meeting contained misleading information, and that the decision of the Regents was contrary to the findings which were adopted. Magrath argued that this inconsistency made it difficult to ascertain or maintain any standard of performance for faculty at the University. A copy of this letter was sent to King.
 
 
 18
 The Regents indicated that a hearing would be held to consider the rescission request. Each of the parties again sent briefs to the Regents prior to the hearing. In addition, a number of faculty and community members wrote to the Regents expressing their views concerning the Regents' decision to place King on probation.
 
 
 19
 On January 12, 1984, the Regents met to consider the rescission request. They again heard arguments from counsel. King again spoke on his own behalf, as did a minister who asked the Regents not to rescind their previous action. The Regents voted in public session to rescind their previous action. The Regents then went into closed session, where they voted 8-4 to terminate King for cause.
 
 II.
 
 20
 King initially contends that he was not accorded substantive due process, that is, he asserts that there is not substantial evidence supporting the decision of the University to terminate him for cause. It is, of course, not for the District Court or for this Court to determine de novo whether we would terminate King based on the evidence presented during the hearings afforded King by the University. Nor does the District Court or this Court sit in review of the determination by the University of Minnesota to terminate King as we would review a determination by an administrative agency. Rather, it was King's burden in this case to prove in the District Court that he was dismissed without being afforded procedural due process[4] or that he was dismissed for a constitutionally impermissible reason.[5] Cf. Perry v. Sindermann, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); Professional Association of College Educators v. El Paso County Community College District, 730 F.2d 258, 264-65 (5th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984).
 
 III.
 
 21
 King contends that he was not accorded sufficient procedural due process by the University in connection with his dismissal. In Brouillette v. Board of Directors of Merged Area IX, 519 F.2d 126 (8th Cir.1975), this Court outlined the requirements of due process in a similar case:
 
 
 22
 1) clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to them;
 
 
 23
 2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges;
 
 
 24
 3) a reasonable time and opportunity to present testimony in his or her own defense; and
 
 
 25
 4) a hearing before an impartial board or tribunal.
 
 
 26
 Id. at 128.
 
 
 27
 We will not here again recount the exhaustive procedural protections King was afforded, but merely hold that on the basis of uncontradicted evidence adduced at trial, the District Court properly could have directed a verdict for defendants on this claim had the case been tried before a jury. We are satisfied that King received the process he was due.
 
 IV.
 
 28
 King's next claim against the defendants is that he was subjected to disparate treatment, that is, terminated, on the basis of his race. The District Court rejected King's contention as wholly unsupported. King's counsel argues in his brief on appeal that King made out a prima facie case of racial discrimination, and that the District Court thereafter erred in not shifting the burden of proof to defendants. Defendants respond in their brief, citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981), and Goodwin v. Circuit Court of St. Louis County, 729 F.2d 541 (8th Cir.), cert. denied, --- U.S. ----, --- U.S. ----, 105 S.Ct. 112, 1194, 83 L.Ed.2d 55, 84 L.Ed.2d 339 (1984), for the proposition that:
 
 
 29
 [t]he order and burdens of proof laid down by the Supreme Court for Title VII cases apply also to cases of race and sex discrimination in employment brought under 42 U.S.C. Secs. 1981 and 1983. The burden of proof remains at all times on the plaintiff.
 
 
 30
 Id. at 545 (citations omitted). In his reply brief, King's counsel reasserts that the burden of proof in this case should have been shifted to defendants.[6]
 
 
 31
 We need not reach King's burden of proof claim because an examination of the instant case reveals that King failed to establish a prima facie case of discrimination. There was simply no evidence presented from which a discriminatory motive on the part of defendants in terminating King's employment properly could have been inferred.[7]V.
 
 
 32
 King also alleged before the District Court that he had made controversial statements in one of his classes and that he was dismissed on the basis of these statements in violation of his First Amendment rights. King does not here contest the finding of the trial court that he adduced absolutely no evidence that anyone involved with his termination was ever aware of any of his in-class statements; we note that the District Court properly could have directed a verdict for defendants on this claim had the case been tried before a jury.
 
 VI.
 
 33
 King's final contention is that the District Court improperly dismissed his damage claims,[8] and thereafter erred in concluding that since the only relief remaining that could be awarded was injunctive or declaratory in nature, he was not entitled to a jury trial.
 
 
 34
 We do not reach the merits of King's contention that his damage claims were improperly struck or his contention that he was entitled to a jury trial. We merely note that in light of our determination that a directed verdict could have been entered against King on all of his claims, the dismissal of his claim for damages was, at most, harmless error. We further note that since King would not have been denied his constitutional right to a jury trial had the District Court simply entered a directed verdict for defendants, Galloway v. United States, 319 U.S. 372, 389-96, 63 S.Ct. 1077, 1086-90, 87 L.Ed. 1458 (1943), the failure of the District Court to grant King a jury trial in the present case was also, at most, harmless error. Laskaris v. Thornburgh, 733 F.2d 260, 264, 266 (3rd Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984).
 
 
 35
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 The Honorable Edward C. Devitt, Senior United States District Judge for the District of Minnesota
 
 
 [2]
 The Department later became the Department of Afro-American and African Studies
 
 
 [3]
 Cause for termination under the Tenure Code consists of such cause as seriously interferes with the person's capacity competently to perform his duties, or seriously interferes with his usefulness to the University. See Appendix at 27
 
 
 [4]
 King was a tenured professor. Defendants do not dispute that King had a protectible interest in continued employment and was therefore entitled to procedural due process. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)
 
 
 [5]
 The state may, of course, not dismiss an employee for a constitutionally impermissible reason, whether or not the employee has a protectible interest in continued employment. See Perry v. Sindermann, 408 U.S. 593, 597-98, 92 S.Ct. 2694, 2697-98, 33 L.Ed.2d 570 (1972)
 
 
 [6]
 King's counsel seeks to distinguish Goodwin on the basis that, while the rule of law announced in Goodwin applies to race and sex discrimination cases, Goodwin itself was only a sex discrimination case. King's counsel does not discuss Burdine which, while a Title VII case, persuasively discusses the allocation of the burden of proof in cases involving disparate treatment
 
 
 [7]
 King's evidence of purposeful racial discrimination consisted of 1) the fact that he was the only black full professor ever terminated at the University of Minnesota; 2) a query by a faculty panel member, in the course of determining who was attending King's hearing before the faculty panel, as to whether a woman at the hearing whose name was King (who was white) was his wife; 3) a statement by the Dean of the College that he believed that race depended not on skin color but on genotype; 4) speculation by a former chairman of the Afro-American and African Studies Department that some white members of the faculty might not have been terminated had they performed as badly as King (although King had, in her opinion, repeatedly failed to maintain a minimum level of performance); 5) the fact that a Regent, in speaking during the hearing to a minister and his group of 1200 petitioners, many of whom were black, referred to the minister's group as "your people"; and 6) the following statistics on the percentage of blacks in the following populations: University of Minnesota Academic Appointments--1.4%; University of Minnesota Faculty--0.8%; University of Minnesota College of Liberal Arts Faculty--1.8%; University of Minnesota College of Liberal Arts Students--1.7%. Approximately 1.3% of the population of the State of Minnesota is black. See United States Bureau of the Census, Statistical Abstract of the United States: 1985 36 (105th ed. 1984) (figure derived from the 1980 census)
 
 
 [8]
 The District Court dismissed the damage claims against the University of Minnesota and against those defendants who were acting in their official capacities on the ground that such damages were barred by the Eleventh Amendment. The District Court dismissed the damage claim against Lukermann individually because it concluded the claimed injuries could not have been caused by Lukermann