Joyce GRAGG, Personal Representative
of the Estate of LeRoy Gragg,
Plaintiff,

v.

CITY OF OMAHA, a Municipal Corporation, and Brenda J. Smith (now known as Sullivan), Defendants.

No. CV 89-0-674.

United States District Court,
D. Nebraska.

Jan. 29, 1993.

Daniel W. Ryberg, Omaha, NE, for plaintiff.

Thomas O. Mumgaard & Mary M. Elliston, City Attorney's Office, Omaha, NE, for defendants.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

Plaintiff, as personal representative of the estate of LeRoy Gragg, sued the City of Omaha, Nebraska, and police officer Brenda J. Smith (now known as Sullivan), contending that Smith was responsible for the death of LeRoy Gragg when, as an off-

duty police officer, she stopped the transit bus Gragg was driving and left him unprotected with the result that he was shot and killed. Plaintiff asserted two theories of recovery. The first theory of recovery was that, in essence, Smith had seized Gragg and because Smith acted with deliberate indifference, the killing of Gragg by a third party violated Gragg's constitutional rights, entitling his estate to recover against the City of Omaha and the police officer. The second theory of recovery, essentially a state law negligence claim, asserted that Smith was negligent in leaving Gragg unprotected on the street after stopping him.

As to the first theory of recovery, the jury returned a verdict in favor of the city and defendant Smith (Filing No. 66, ¶ I.B). As to the second theory of recovery, I submitted the state law negligence claim to the jury as an advisory jury, although I did not inform the jury that it was acting in an advisory capacity. The jury found in favor of the plaintiff and against the City of Omaha and Smith, returning damages of $506,719.55 for medical, hospital, and funeral expenses and the amount of contribution LeRoy Gragg would have made to his spouse and next of kin had he survived (Filing No. 66, ¶¶ IV.A and V.B & C).

## I. No Right to Jury Trial

■ I concluded the plaintiff did not have a right to a trial by jury on the pendent state negligence claim because that claim was brought under the Nebraska Political Subdivision Tort Claims Act, Neb.Rev.Stat. §§ 13–901 to 13–926 (Reissue 1987; 1991 Supp.; 1992 Cum.Supp.). In Nebraska it is clear that the waiver of sovereign immunity is limited by, among other things, the procedures which are available for trial of claims against political subdivisions:

> ... no political subdivision of the State of Nebraska shall be liable for the torts of its officers, agents, or employees, and **that no suit shall be maintained** against such political subdivision or its officers, agents, or employees on any tort claim **except to the extent, and only to the extent, provided by the Political Subdi-**

**visions Tort Claims Act.** The legislature further declares that it is its intent and purpose through this enactment to provide uniform procedures ... and that **the procedures provided by the act shall be used to the exclusion of all others.** Neb.Rev.Stat. § 13–902, 1992 Cum.Supp. (emphasis added).

The Act specifically provides that such tort claims "shall be heard and determined by the appropriate court *without a jury.*" Neb.Rev.Stat. § 13–907 (Reissue 1987). (emphasis added). Moreover, resolution of a suit against the political subdivision constitutes a complete bar to any further action against the employees of the political subdivision whose act or omission gave rise to the claim. Neb.Rev.Stat. § 13–909 (Reissue 1987).

Although the issue was not raised before the magistrate judge who pretried this case, during trial defendants argued that the matter could not be submitted to the jury insofar as the pendent state claim was concerned because the Nebraska Political Subdivision Tort Claims Act barred such a submission. Finding that the Act was integrated, that the trial procedures could not be separated from the substantive law, and that the Seventh Amendment to the United States Constitution did not provide for a jury trial in cases such as this, I granted the defendants' motion to amend the pretrial order, and ordered that the pendent state claim would be tried to the court. But, I also ordered that, pursuant to Fed. R.Civ.P. 39(c), the jury would act as an advisory jury. The use of an advisory jury on the second theory seemed to make sense because the plaintiff had a right to a jury trial as to the first theory of recovery (Filing No. 61).

My decision that the pendent state claim was not triable to a jury was based primarily on my opinion in *Westcott v. City of Omaha,* No. CV88-0-28, 1988 WL 383125 (April 11, 1988) (copy attached to Filing No. 61). In *Westcott* I concluded that the Act was integrated, that the trial procedures could not be separated from the substantive law, and that, since there was no common law right to sue the political subdivi-

sions of the State of Nebraska, there was no Seventh Amendment right to a jury trial. *See Galloway v. United States,* 319 U.S. 372, 388–89, 63 S.Ct. 1077, 1086–87, 87 L.Ed. 1458 (1943), "it can hardly be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign. Whatever force the Amendment has therefore is derived because Congress, in the legislation cited, has made it applicable." (Footnotes omitted.)

■ I am thus confronted with the question of what I should do with the advisory jury verdict on the pendent state law claim. Leading text writers have suggested that I must make my own decision and that I may totally disregard the findings of the advisory jury:

> The responsibility for decision remains with the judge when an advisory jury is used. He must prepare the findings of fact and conclusions of law, and it is wholly in his discretion whether to accept or reject, in whole or in part, the verdict of the jury. There have been occasional suggestions that the findings of an advisory jury should be accepted if they are sustained by the evidence or if they are not clearly erroneous, but these misconceive the function of an advisory jury and the complete freedom the judge has in using its findings. Review on appeal is of the findings of the court as if there had been no verdict from an advisory jury, and there can be no review of supposed errors related to rulings before and instructions to the advisory jury.

9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2335, at 125–27 (1971) (footnotes omitted).

I must, therefore, issue findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a). While I believe a reasonable jury could reach the same conclusion this jury came to in finding Smith negligent, as the fact finder I disagree with the jury's verdict, and, accordingly, I find in favor of the defendants. My findings of fact and conclusions of law are as follows: [1]

## II. Findings of Fact

1. The following undisputed facts are taken from the pretrial conference order (Filing No. 45, ¶ C):

a. The plaintiff, Joyce Gragg, is the personal representative of the estate of LeRoy Gragg, filed in the district court of Pottawattamie County, Iowa, at probate No. 3704.

b. Defendant City of Omaha is a municipal corporation organized pursuant to the laws of the State of Nebraska.

c. Defendant Brenda Smith (now known as Sullivan) is a resident of the State of Nebraska and at all relevant times was employed as a sergeant with the Omaha Police Department and was acting in her official capacity.

d. On or about July 5, 1988, LeRoy Gragg was employed by the Metropolitan Area Transit Company (MAT), in Omaha, Nebraska, as a bus driver. At about 2:45 p.m. on July 5, 1988, he was driving a bus southbound on 30th Street near Taylor Street in Omaha, Nebraska, when he became engaged in a verbal dispute with Louis Pratt, a passenger on the bus. During the dispute, Louis Pratt revealed he had a gun.

e. Louis Pratt left the bus driven by LeRoy Gragg and followed it for several blocks. Near the intersection of 30th and Bedford Streets the bus stopped. Louis Pratt went to the front of the bus and fired a gun at LeRoy Gragg through the windshield, fatally wounding him.

f. Shortly before Louis Pratt came to the front of the bus, Sergeant Smith spoke to LeRoy Gragg near the door of the bus. Sergeant Smith was off duty and not in uniform at the time. Sergeant Smith went to a telephone and called for police to come to the scene. Sergeant Smith was telephoning for police assistance when Louis Pratt shot LeRoy Gragg.

**1.** To the extent that any finding of fact is more properly construed as a conclusion of law, it shall be so interpreted. Conversely, any conclusion of law which is more properly construed as a finding of fact shall be so interpreted.

g. Plaintiff has complied with the Nebraska Political Subdivision Tort Claims Act.

2. It is helpful to set the scene. Exhibit 9 is a large aerial photograph which depicts the scene of this tragedy. Ames Avenue is on the north and Bedford Avenue is on the south.

a. The evidence reveals that Gragg was driving a transit bus commonly used in metropolitan areas. The bus had a radio that enabled Gragg to talk to a bus dispatcher. On July 5, 1988, it was hot. The bus was air conditioned. Gragg picked up a passenger somewhere around Ames Avenue. When Gragg noticed that a window in the back of the bus was raised, he went to the back of the bus. Gragg engaged Pratt in a conversation which became heated. Pratt withdrew a weapon from a box of some sort and Gragg backed off. At a location slightly south of Taylor Street on the west side of the street Pratt got off the bus. For reasons that are not clear to anyone, Gragg drove the bus over the sidewalk and struck Pratt. Gragg drove the bus back onto the street and proceeded south on 30th Street at a high rate of speed.

b. One of the passengers, Shirley Haynes, observed the incident and the fact that the bus driver hit Pratt. She demanded to be let off the bus. Slightly north of Sprague Street, perhaps two-and-a-half blocks from where the incident occurred, Haynes exited the bus. When she got off the bus, she observed Pratt running up the street toward the bus with his gun drawn. Haynes remembered that as the bus driver hit Pratt and left, he was looking in a mirror. The last Haynes saw of the bus and Pratt was the bus about half a block or more ahead of Pratt and going fast. Haynes went into an establishment that sold chicken and called 911 for the police emergency dispatch center. Among other things, she told the 911 operator that the bus had run over a man and that the man was running after the bus with a gun (Plaintiff's Exhibit 8). This call was received at 14:47 (2:47 p.m.) (Plaintiff's Exhibit 1).

c. At about the same time, LeRoy Gragg called his bus dispatcher. Among other things, Gragg told the dispatcher that someone had pulled a gun on him, that he had "accidently" hit the man with the bus, and that the man was "back about five blocks still chasing." (Plaintiff's Exhibit 6). Gragg requested police assistance. As Gragg was having a conversation with his dispatcher, he informed the dispatcher that "I have a policeman here with a badge in a civilian car." (Plaintiff's Exhibit 6, at 2). The dispatcher inquired as to whether things were "taken care of" and Gragg responded "I hope so." (*Id.*) Gragg also noted that since he had hit a man: "I need 911 and I need a supervisor and I want off this damn bus for the rest of the day...." (*Id.*) Someone, probably a MAT representative, called 911 and indicated that there was "a little disturbance," that there was supposed "to be a plain clothes officer there," and that "we'll still [need] a[n] officer." (Plaintiff's Exhibit 8, at 2). This call was received about 14:47 (2:47 p.m.) (Plaintiff's Exhibit 1).

d. At about the time the bus hit Pratt, Sergeant Smith (now known as Sullivan) was off duty and northbound on 30th Street in her private car. Near 30th and Taylor Streets she saw "a MAT bus drive up over the curb, so I immediately slowed down because of, of course, that is unusual, and then I saw the MAT bus strike a black male party that was on the sidewalk." (Court's Working Transcript at 73). The man, later identified as Pratt, fell to his knees and that was all the sergeant could see at that point. Sergeant Smith did not see Pratt exit the bus. Sergeant Smith did not see Pratt carrying a gun. The man picked himself up and began "jogging." (Court's Working Transcript at 74). The bus accelerated southbound on 30th Street. Sergeant Smith's "instinct was that he was trying to let the bus driver know he had hit him ... he wasn't running." (Court's Working Transcript at 75).

3. Thinking she had witnessed a hit-and-run personal injury accident with a MAT bus, a Class I misdemeanor, Sergeant Smith drove her car to the corner of 30th and Taylor and turned westbound. She drove west on Taylor to a parking lot entrance, turned north into the parking lot, and then headed back east and returned to 30th Street.

a. When Sergeant Smith came back onto 30th Street, she could no longer see Pratt. Unable to find Pratt, and assuming he was not injured, Sergeant Smith began to pursue the bus. Even though Smith was off duty, the Omaha Police Division requires its officers to intercede in an emergency or when a crime is committed in their presence, whether they are in uniform or not, or face disciplinary action. After Smith got back on 30th Street, she observed the bus south of the red circle on Exhibit 9. The red circle on Exhibit 9 depicts the chicken establishment from which Haynes called the 911 operator.

b. Driving at speeds of between 45 and 50 m.p.h., Smith began chasing the bus. According to Smith, the bus was going at a high rate of speed. Sergeant Smith flashed her badge out the window as she came abreast of the bus, and the bus driver nodded his head in an affirmative manner. The bus driver was talking on a phone but began to pull forward to stop along the curb. The bus driver stopped along a curb on the west side of 30th Street south of Bedford Avenue in front of a service station. Sergeant Smith parked her vehicle in front of the bus, probably 50 to 75 feet ahead of it, so as not to block the service station lot. It is approximately 11 blocks (7/10 of a mile, according to Smith, who later "clocked" the distance) from Taylor Street to Bedford Avenue where Smith was able to stop the bus. It is approximately 9 blocks from Sprague Street, near the location of the chicken establishment, to Bedford Avenue.

c. Smith approached the bus. The bus driver evidently opened the bus door. Smith had her badge clipped to her waist. The bus driver was talking on his radio phone. Smith could overhear the conversation. The bus driver said "he wanted off this damn bus. He was tired of being threatened. He wanted the rest of the day off, and he wanted off now." (Court's Working Transcript at 87). Smith waited until the bus driver finished his conversation and then engaged in the following colloquy with Gragg:

I said, sir, why did you hit that guy back there and keep going, and he says, "He had a fucking gun, you know, he was threatening me and stuff," and I said, "Sir, I'm not cussing at you. Stop cussing at me. Just tell me what happened." I said, "Sir, why did you hit the guy back there and leave," and that's when he said to me again, "The guy had a gun. He was threatening me with the gun," and I said, "Okay. I will be right back. I'm going into the service station and call for cruisers to come here. We want to go check on the guy at 30th and Taylor."

(Court's Working Transcript at 88).

4. According to Smith, Gragg did not tell her anything about Pratt following the bus. Nor did Gragg say it was likely that Pratt would appear where the bus was now parked. Gragg did not object to Smith leaving the bus. When she stepped down, he closed the door.

a. Smith walked between 25 and 30 feet west into the service station. She knew one of the proprietors of the service station. She asked to use the phone. The phone was in a glass-enclosed office. From where the phone was located, Smith could see the west side of the bus but not the front of the bus. Smith dialed a special telephone number which allowed her direct access to the 911 operator and which identified her as a police officer. This telephone number is not the one commonly used by citizens. This conversation appears as call #3 of Plaintiff's Exhibit 8. The call was received about 14:49 (2:49 p.m.) (Plaintiff's Exhibit 1). As Smith is describing what Gragg has told her and what she observed, the operator responds: "I got … another call now that ah this ah ah person that was hit was chasin' after the bus." At

that point, Smith heard a gunshot, whereupon she advised the operator to get a cruiser to the location.

b. Smith ran out of the service station, pulled her service revolver out of her purse, went to the bus, pushed the door open, and saw the bus driver lying there. Observing a man running from the bus, she turned to the running man. She told the man, "Police. Halt." (Court's Working Transcript at 97). The man looked back at her but kept running. Trying to avoid getting hit by cars on 30th Street, Smith sighted her firearm at the man and discharged it. She missed.

c. Smith returned to the bus and found Gragg lying in a pool of blood. She immediately returned to the gas station and called for a rescue squad. Some 30 minutes later LeRoy Gragg died of a gunshot wound to his heart.

5. Phyllis Mosely–West, who overheard the conversation between Gragg and Smith, boarded the bus on the northwest corner of 30th and Bedford. As the bus proceeded across the intersection, she observed the bus driver making conversation with a woman in a car next to him. The bus driver pulled across the intersection and came to a stop.

a. At that point Mosely–West observed what she described as a harsh or angry conversation between Gragg and Smith. Mosely–West did not hear Gragg tell anyone that a man was chasing him. According to Mosely–West, there was nothing in Gragg's conversation with Smith that caused her any alarm. As Mosely–West put it: "I thought whatever had happened was over with." (Court's Working Transcript at 26).

b. Mosely–West stayed on the bus after Smith left to make the telephone call. While Gragg appeared to be tense and angry, she did not observe him look into the rearview mirrors of the bus. According to Mosely–West, Gragg did nothing while Smith was gone which caused her any concern. According to Mosely–West: "If I thought that I was in danger, I wouldn't have stayed on the bus." (Court's Working Transcript at 28). The next thing that happened was that Mose-ly–West heard a gunshot and she dropped to the floor.

6. The second witness who was on the bus when it was stopped by Smith was Mary Louann Stonebrook. Stonebrook got on the bus at 30th and Taylor Streets. She heard the exchange between Gragg and Pratt on the bus. The next thing she heard was someone screaming "he's got a gun." She observed Pratt with a gun pointing at the bus driver. Pratt got off the bus and the next thing Stonebrook heard "was a thump and a lady screamed that the bus had hit him, hit the gentleman that got off the bus." (Court's Working Transcript at 71).

a. The bus proceeded southbound and stopped to let off a passenger (probably Haynes). Stonebrook saw the bus driver make a radio call but could not hear what was being said. The bus proceeded south until she saw a woman in a car making a "hand motion pointing him to pull over." (Court's Working Transcript at 74). The bus pulled over near a service station at 30th and Bedford.

b. Stonebrook got off the bus and waited because it was her impression that if she waited long enough she would be able to get back on the bus and leave. As she waited and observed Smith go into the service station, she saw Pratt "running around the back side of the bus and went in front of the bus facing up and shot the bus driver through the window." (Court's Working Transcript at 80).

c. Stonebrook testified she was not concerned as she waited for the bus that the man with the gun might show up. Indeed, she testified that when Pratt did show up: "I was really surprised." (Court's Working Transcript at 89).

7. The foregoing are, in my judgment, the important facts. While there are other subsidiary facts which "fill in the picture," they are not determinative and need not be recited here. Moreover, because I find no liability I shall not discuss the facts as they relate to damages.

### III.  Conclusions of Law

1.  Pertinent Nebraska law is stated in two jury instructions.

a.  The first pertinent jury instruction is part III of Instruction No. 7 (Filing No. 63).  Part III of Instruction No. 7 states:

#### A.

In order to prove her second theory of recovery, the burden is on the plaintiff to establish by a greater weight of the evidence each of the following elements:

**First,** that defendant Smith (now known as Sullivan) created a custodial or special relationship with LeRoy Gragg (A "custodial relationship" arises when a police officer stops a citizen and, thereafter, a reasonable person in the citizen's situation would have a reasonable belief that he or she was not free to go.  A "special relationship" arises when a police officer gives verbal assurances or engages in conduct demonstrating that the police have assumed the duty to protect a citizen and, thereafter, a reasonable person in the citizen's situation would have a reasonable belief that the police officer would protect the citizen.);

**Second,** that defendant Smith (now known as Sullivan) was negligent in leaving LeRoy Gragg unprotected on the bus when it is claimed she knew or should have known that it was highly probable he was in danger from Louis Pratt;

**Third,** that the defendant Smith's (now known as Sullivan) acts or failures to act were a proximate cause of LeRoy Gragg's shooting;

**Fourth,** that the defendant Smith's (now known as Sullivan) acts or failures to act were a proximate cause of damages as defined in Instruction(s) No. 14, 15;

**Fifth,** insofar as the City of Omaha is concerned that Smith's (now known as Sullivan) acts were within the scope and course of her employment.  I instruct you that this fact has been proven.

#### B.

If plaintiff has *not* met this burden of proof, then your verdict on the second theory of recovery must be for the defendants.

On the other hand, if plaintiff *has* met this burden of proof, then your verdict on the second theory of recovery must be for the plaintiff and against defendants.

b.  I emphasize that, with an exception not pertinent here, neither the plaintiff nor the defendants had any objections to part III of Instruction No. 7 at the jury instruction conference.  The only objection was plaintiff's argument that there was no need to include a reference to "special relationship" since "a custodial relationship" was all that was required.  Since I find that Gragg was in a custodial relationship, I need not reach the issue of what is a "special relationship" under Nebraska law.

c.  The other jury instruction which is pertinent, and to which there was no objection, is Instruction No. 10 (Filing No. 63) defining negligence: "Negligence is doing something that a reasonably careful person would not do under similar circumstances, or failing to do something that a reasonably careful person would do under the circumstances."

■  2.  Defendant Smith created a custodial relationship with LeRoy Gragg. There is no question but that Smith stopped the bus by displaying her badge. Given this display of authority, the heated exchange between Gragg and Smith, the fact that Smith had observed what she believed to be a hit-and-run accident, and the explanation that the altercation between Pratt and Gragg involved a gun, I think Gragg, viewed as a reasonable person, would have had a reasonable belief that he was not free to go at least until Smith completed her telephone call.

■  3.  But I do not believe Smith was negligent in leaving LeRoy Gragg unprotected on the bus when, it is claimed, she knew or should have known it was highly probable he was in danger from Louis Pratt.  I come to this conclusion because I do not believe Smith knew or should have

known that it was highly probable Gragg was in danger from Louis Pratt.

a. I especially credit the testimony of defendant Smith (now known as Sullivan). She was an extremely credible witness.

b. Smith was a sergeant at the time of this unfortunate tragedy, and had significant experience as a police officer. I further note that she is now a lieutenant, which makes her one of the two highest ranking female police officers in the Omaha Police Division.

4. Smith testified, and there is no evidence to the contrary, that LeRoy Gragg did not tell her he was fearful that Pratt was about to arrive at the scene. There was nothing about Smith's conversation with Gragg that would have or should have alerted Smith to the fact that Pratt was about to arrive on the scene. The fact that Gragg did not relay to Smith a fear of imminent peril is confirmed by the testimony of Mosely–West.

5. It is true that Smith observed Pratt "jogging" after the bus after it knocked him down. Thus I suppose it could be argued that once Gragg told Smith Pratt had a gun she should have been concerned because she had seen Pratt jogging after the bus. There are a number of things, however, which lead me to believe that Smith was not negligent in failing to make this connection.

a. First, Smith saw Pratt jogging after the bus about eleven blocks north of where she later stopped the bus at 30th and Bedford. After Smith observed Pratt jogging after the bus, she never saw him again, but the bus proceeded south at a high rate of speed which caused Smith to drive between 45 and 50 m.p.h. to catch it. It was not negligent for Smith to conclude that Pratt could not have negotiated the 11–block dis-

tance in so short a time by jogging on foot.

b. Moreover, the testimony of Ms. Stonebrook also establishes that Smith was acting reasonably when she concluded that Pratt was not likely to appear soon. Stonebrook, who had been on the bus from the time Pratt and Gragg engaged in their first altercation, was "really surprised" when Pratt showed up at 30th and Bedford.

6. Also, I do not think it was negligent to leave Pratt on the bus. Smith was going into a service station not much more than 30 feet away from the bus. She would be making a brief telephone call during which time the bus would be in sight through the glass window.

7. Still further, I do not think Smith was negligent in failing to use the bus radio phone. She knew Gragg had called the bus dispatcher because she overheard part of the conversation. She also knew Gragg had reported that he wanted off the bus because he was tired of being threatened. Thus she knew that Gragg had made some sort of report to his dispatcher.

a. If Smith had used the bus phone, she would have had to speak to a dispatcher who in turn would have had to call 911 and relay her instructions. This sort of message relay system was fraught with the possibility of error and confusion.

b. On the other hand, by the simple expedient of walking no more than 30 feet to a service station, Smith could call 911 with her special access number and obtain immediate and direct access to an operator who would know that Smith was a police officer who needed immediate assistance.

■ 8. In summary, I conclude that Smith (now known as Sullivan) was not negligent.[2]

---

**2.** The defendants moved for judgment as a matter of law under Fed.R.Civ.P. 50 at appropriate times. I took their motions under advisement. I now deny them. While I conclude that Smith was not negligent, I cannot say, as required by Rule 50, that there was "no legally sufficient evidentiary basis for a reasonable jury [or judge] to have found for" plaintiff on the second

theory of recovery. Since the jury found in favor of the defendants on plaintiff's first theory of recovery, I need not determine whether or not defendants' motion for judgment as a matter of law on the first theory of recovery should be granted. Suffice it to say that plaintiff's case on the first theory of recovery was tenuous at best, inasmuch as plaintiff was required to

IT IS ORDERED that:

(1) The Clerk of the United States District Court for the District of Nebraska is directed to enter judgment on the jury's verdict (Filing No. 66) providing that plaintiff shall take nothing as against defendants on plaintiff's first theory of recovery;

(2) The Clerk of the United States District Court for the District of Nebraska is directed to enter judgment providing that plaintiff shall take nothing as against defendants on plaintiff's second theory of recovery, pursuant to the court's findings of fact and conclusions of law;

(3) Defendants' motion for judgment as a matter of law as to the first theory of recovery is moot and therefore denied;

(4) Defendants' motion for judgment as a matter of law as to the second theory of recovery is denied as there was a sufficient evidentiary basis to submit the matter to the finder of fact.

prove that Smith acted intentionally, recklessly, or callously (Instruction No. 7, Part II).